834 F.2d 326
 90 A.L.R.Fed. 631, 56 USLW 2363
 MONMOUTH COUNTY CORRECTIONAL INSTITUTIONAL INMATES, Kevin
Michael Fitzgerald, Joseph Ricciardi, Raymond Ciccone,
Michael A. Michael, Darrell Kelly, Edmund J. Spies, Jr.,
John Paul Clayton, John Joseph Wilburn, Louis D. Hughes,
Kenneth A. Van Note, Lawrence (Tony) Hester, Albert
Maddocks, Tom Forsythe, Tom Visicaro, Robert Thacker, Robert
Thomas, and Leslie Greene, on behalf of themselves and all
others persons similarly situated
v.
William LANZARO, Monmouth County Sheriff; Nelson Stiles,
Warden, Monmouth County Correctional Inst.; Jacob Lewis,
Physician, Monmouth County Correctional Inst.; Harry
Larrison, Jr., Director, Monmouth County Board of Chosen
Freeholders; Clement V. Sommers, Frank A. Self, Thomas G.
Powers, and Ray Kramer, Members, Monmouth County Board of
Chosen Freeholders, and their successors in office, all in
their official capacities, and individually, and William H.
Fauver, Commissioner, New Jersey State Department of
Corrections, and his successor in office, in his official
capacity, and individually, Appellants.
 No. 86-5527.
 United States Court of Appeals,
Third Circuit.
 Argued March 19, 1987.
Decided Nov. 25, 1987.
 
 Malcolm V. Carton (argued), Carton and Faccone, Avon, N.J., for appellants.
 Catherine A. Hanssens (argued), Audrey Bomse, Dept. of the Public Advocate, Office of Inmate Advocacy, Trenton, N.J., for appellees.
 Charles H. Jones, Jr., Rutgers Law School Prison Law Clinic, Newark, N.J., for amicus New Jersey Ass'n on Correction.
 Janet Benshoof, Reproductive Freedom Project, American Civil Liberties Union, New York City, for amici The American Civil Liberties Union and The American Public Health Ass'n.
 Before HIGGINBOTHAM, MANSMANN and ROSENN, Circuit Judges.
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 OPINION OF THE COURT
 
 1
 This appeal arises from the order of the district court preliminarily enjoining appellants Monmouth County ("the County") from requiring women prisoners to secure court-ordered releases and their own financing in order to obtain an abortion while in the County's custody. We have jurisdiction pursuant to 28 U.S.C. Sec. 1292(a)(1) (1982). For the reasons set forth below, we will affirm in part and modify in part the judgment and order of the district court.
 
 I.
 Facts and Procedural History
 
 2
 The genesis of this appeal is a class action instituted by inmates of Monmouth County Correctional Institution ("MCCI" or "the Institution") against MCCI administrators and various county and state officials[1] challenging overcrowding and other conditions and practices at the Institution, including the adequacy of health care services. On October 10, 1984, the district court issued its opinion and order granting constitutionally-mandated relief from the overcrowding and other conditions of confinement challenged by the inmates.[2] Monmouth County Correctional Inst. Inmates v. Lanzaro, 595 F.Supp. 1417 (D.N.J.1984) ("MCCI Inmates I "). Subsequently, MCCI inmates applied for an Order to Show Cause, seeking additional preliminary injunctive relief specifically pertaining to the health care needs of pregnant inmates. By Consent Judgment dated March 8, 1985, the parties agreed to resolve "the most emergent of those issues having [an] impact on pregnant female inmates." Joint Supplemental Appendix and Addendum to Brief of Plaintiffs-Appellees ("SA") at 1. Those issues, which concerned certain prenatal, medication and dietary needs of pregnant inmates,[3] did not, however, concern any services related to the termination of pregnancies. This latter issue--abortion-related services for pregnant inmates--is the subject of this appeal.
 
 
 3
 On February 19, 1986, Jane Doe was incarcerated at MCCI. Seven days later, a pregnancy test was administered to Doe and returned positive. On or about March 3, 1986, Doe informed MCCI medical staff that she desired to terminate her pregnancy. Doe was advised by MCCI authorities, however, that, pursuant to the Institution's policy of providing abortions only where a medical emergency presents a life-threatening situation to the mother,[4] the Institution would neither provide Doe with access to nor fund an abortion in the absence of a court order. See Appendix of Appellants ("App.") at A18, p 5; A20, p 3. Consequently, on or about April 4, 1986, MCCI inmates again applied for temporary and preliminary injunctive relief. Specifically, the inmates requested that the County be ordered to provide Doe, then approximately nine weeks pregnant, and other members of the class with certain medical care and services to facilitate their decisions to terminate their pregnancies.
 
 
 4
 The inmates' application for temporary restraints was accompanied by affidavits of two physicians supporting Doe's decision to terminate her pregnancy. Dr. John Josimovich concluded that "abortion [wa]s especially appropriate ... because Jane Doe [was] ... a chronic drug abuser." SA at 7. Dr. Susan Neshin maintained that Jane Doe was not emotionally equipped to carry a child to term, see SA at 10, and thus concluded "that the only medically sound and humane alternative [wa]s to grant Ms. Doe the therapeutic abortion she desires." SA at 11.
 
 
 5
 Pending resolution of the inmates' application for injunctive relief, Jane Doe was released to secure an abortion. Doe's release did not occur, however,--due to MCCI officials' insistence that she first obtain a court order--until more than a month after her initial request to terminate her pregnancy. Following Doe's release, the district court denied the inmates' application for a temporary restraining order and set a date for the preliminary injunctive hearing. Prior to that hearing, a second inmate, Mary Smith,[5] requested and was denied access to and funding for an abortion by MCCI officials.
 
 
 6
 On April 8, 1986, the district court ordered the County to show cause why a preliminary injunction should not issue enjoining the County from refusing to provide necessary medical care to all pregnant inmates at MCCI, including (1) access to counseling, which would include discussion of the woman's option to terminate or continue her pregnancy; (2) access to medical facilities for the purpose of obtaining an abortion; and (3) funding for abortions on the same basis as is provided for any other medically necessary procedure. MCCI inmates argued that the Institution's policy of requiring pregnant inmates who want an abortion to apply for court-ordered release constituted an unconstitutional infringement of their right to privacy under Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The inmates also alleged that the County's refusal to provide pregnant inmates with all necessary medical care related to their pregnancies--including abortion-related services--constituted a deliberate indifference to their serious medical needs and deprived them of equal protection of the law in violation of the eighth and fourteenth amendments to the federal Constitution, respectively. Finally, MCCI inmates maintained that the County's discriminatory practices were in violation of the New Jersey Constitution. In response, the County argued that its obligation to its inmates was limited to assurance of "essential" medical care,[6] and that the provision of "purely elective medical procedures" would pose insurmountable administrative and financial burdens on the County. See Letter Brief from Malcolm V. Carton, Esq. to Hon. Harold A. Ackerman 2 (Apr. 25, 1986) reprinted in App. at A25. The County further maintained that the restriction of certain rights and privileges was a necessary and legitimate incident to the lawful incarceration of MCCI inmates.
 
 
 7
 After the hearing, the district court on May 29, 1986, granted the inmates' application on the ground that the prerequisites for preliminary injunctive relief had been met. Monmouth County Correctional Inst. Inmates v. Lanzaro, 643 F.Supp. 1217 (D.N.J. 1986) ("MCCI Inmates II "); see Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir.1975); see also Morton v. Beyer, 822 F.2d 364, 367 (3d Cir.1987) (moving party must demonstrate likelihood of success on the merits and irreparable harm; district court may also consider the possibility of harm to others and the public interest).
 
 
 8
 With respect to the challenge to the court-ordered release requirement, the district court held that the inmates had demonstrated a likelihood of success on the merits under both federal and state law. The district court observed that "regulations limiting [fundamental] rights may be justified only by a 'compelling state interest' " under federal law, MCCI Inmates II, 643 F.Supp. at 1222 (quoting Roe, 410 U.S. at 155, 93 S.Ct. at 728), or by a "governmental interest [that] could be deemed overriding" under New Jersey law. Id. at 1223 (citing Farhi v. Commissioners of the Borough of Deal, 204 N.J.Super. 575, 583, 499 A.2d 559, 563 (Law Div.1985)). Moreover, the district court noted that prison officials must adopt "the least restrictive means consistent with the maintenance of prison discipline," MCCI Inmates II, 643 F.Supp. at 1223, in order both to protect the legitimate state interest and to preserve, to the extent possible, the inmates' fundamental rights. Applying these precepts, the district court concluded that, at the threshold, the County had failed to establish that any such compelling interest exists. Even presuming a compelling state interest, the district court held that the challenged regulation did not constitute the least restrictive alternative to protect that interest, and that, therefore, the significant burden imposed by the court-ordered release requirement upon pregnant inmates could not legally be tolerated. See id.
 
 
 9
 Next, focusing on the inmates' claim that the County's refusal to appropriate funds for non-life-threatening inmate abortions was unconstitutional, the district court held that, while valid under the fourteenth amendment to the federal Constitution, the County's policy was invalid under the New Jersey Constitution. MCCI Inmates II, 643 F.Supp. at 1223-25. Examining Supreme Court precedent, the district court concluded that federal case law "establish[es] that the prohibition of funds for abortions [that] are medically necessary, as well as those [that] are purely elective, is constitutionally valid." Id. at 1224. Under New Jersey case law, however, the district court concluded that the County was obligated to provide funding for all requested inmate abortions "necessary to protect the life or health of the mother."[7] Id. at 1225 (original emphasis).
 
 
 10
 Finally, the district court concluded that the inmates had demonstrated a likelihood of success on their contention that the County's refusal to provide funding for all abortions, including those considered elective or nontherapeutic, was a breach of the County's affirmative duty to attend to the medical needs of prisoners in its custody, in contravention of the eighth amendment to the federal Constitution. MCCI Inmates II, 643 F.Supp. at 1225-27. Examining the County policy under the standard set forth in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976),[8] the district court first concluded that, "with respect to those inmates whose release to obtain a recommended elective abortion is precluded by reasons of security, the refusal of the county to provide abortion services [at county expense] constitutes a violation of their eighth amendment rights." MCCI Inmates II, 643 F.Supp. at 1226. Similarly, the district court found that, even as to those inmates who could be released on their own recognizance to obtain an abortion, the County was nonetheless "financially obligated to assume the full cost of its inmates' elective, as well as medically necessary[,] abortions." Id. at 1227. In this regard, the district court considered significant the inmates' "imposed financial dependency ... [as] a result of their incarceration," and thus concluded that "[elective, nontherapeutic a]bortions are simply one type of elective medical treatment to which inmates are legally and equitably entitled." Id.
 
 
 11
 In considering the remaining preconditions to an award of injunctive relief, the district court found that the inmates had demonstrated that, absent the relief sought, they would suffer irreparable harm because the County's court-ordered release requirement "unquestionably imposes substantial delays on the procedure and may, in some instances, thus cause substantial injury to plaintiffs," MCCI Inmates II, 643 F.Supp. at 1228, that could not be adequately compensated by money damages. See id. In balancing the relative hardships, the district court concluded that the equities weighed heavily in favor of granting preliminary injunctive relief--the inmates had carried their burden of demonstrating irreparable harm in the absence of the requested relief, while the County's bald assertion that such relief would impose insurmountable administrative and financial burdens on its resources lacked any elaboration or evidentiary support. To the contrary, the district court found that (1) to provide for a first trimester abortion is "considerably less expensive" than to provide for all the necessary medical care for inmates electing to give birth, and (2) to arrange for one surgical procedure was probably less burdensome than to arrange for all of the pre- and post-natal medical care associated with full term pregnancy. Id. Finally, the district court noted that granting injunctive relief was consistent with the public interest because neither United States nor New Jersey public policy would countenance the continued denial of financial and moral assistance to attend to the serious medical needs of those incarcerated in governmental institutions. See id. Accordingly, on June 30, 1986, the district court issued the following order:
 
 
 12
 1. County defendants shall cease the practice of requiring pregnant inmates who seek to terminate pregnancy to obtain a court-ordered release in order to arrange personally for an abortion.
 
 
 13
 2. County defendants shall, upon receipt of the laboratory results of the pregnancy test administered to women admitted to MCCI, communicate the results to the woman and inform her, if she is pregnant, of her right either to continue the pregnancy or to have an abortion, with costs for all related medical care to be at the county's expense.
 
 
 14
 3. County defendants shall provide professional counseling services, including medical and social counseling, to aid the pregnant inmate in making her decision to terminate or to carry the fetus to term.
 
 
 15
 4. County defendants, through the MCCI medical department staff, shall complete all necessary arrangements at an appropriate medical facility for those inmates seeking an abortion, as soon as practicable following the inmate's decision to terminate the pregnancy.
 
 
 16
 5. County defendants shall assume the full cost of all inmate abortions.
 
 
 17
 6. County defendants, through their medical staff, shall provide all inmates who have a positive pregnancy test with a copy of this order as well as a copy of the March 8, 1985 consent judgment governing provision of prenatal care, in addition to verbally informing them of their rights related to their pregnancies.
 
 
 18
 Id. at 1229.
 
 II.
 Analyzing Prison Regulations
 
 19
 Following oral argument to this Court, the Supreme Court rendered two decisions directly relevant to this appeal. First, in Turner v. Safley, --- U.S. ----, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court considered what level of scrutiny is appropriate in determining the constitutionality of prison regulations. The underlying lawsuit in Turner was a class action by Missouri inmates challenging two regulations promulgated by the Missouri Division of Corrections. The first regulation authorized correspondence " 'with immediate family members who are inmates in other correctional institutions,' and ... correspondence between inmates 'concerning legal matters.' " Turner, 107 S.Ct. at 2258. Other correspondence between inmates at different institutions, however, was permitted only on a discretionary basis. See id. The second regulation challenged by the Missouri inmates authorized inmate marriages only with the permission of the prison superintendent, and then only " 'when there [we]re compelling reasons to do so.' " Id. "Compelling" was narrowly construed to justify marriages only in the event of a pregnancy or the birth of an illegitimate child. Id. In assessing the constitutionality of the challenged regulations, both the district court and the Court of Appeals for the Eighth Circuit employed a "strict scrutiny" standard of review. See id. at 2258. Under strict scrutiny, a prison regulation passes constitutional muster if it is the least restrictive means to accomplish a legitimate penological objective. See generally Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).
 
 
 20
 The Turner Court defined its task as "formulat[ing] a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.' " 107 S.Ct. at 2259 (quoting Martinez, 416 U.S. at 406, 94 S.Ct. at 1808). After reviewing its prior decisions concerning constitutional claims by prisoners, the Court rejected strict scrutiny as the appropriate standard of review. It concluded instead that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. 107 S.Ct. at 2261. In determining the reasonableness of a challenged regulation, Turner instructs reviewing courts to consider (1) the rational relationship between the regulation and the governmental interest put forward to justify it; (2) the existence of alternative means to exercise the asserted right; (3) the impact on prison resources of accommodating the asserted right; and (4) the existence of "ready alternatives" to accommodate the asserted right at "de minimus" cost to valid penological interests.[9] Id. at 2262.
 
 
 21
 Relying on Turner 's reasonableness test, the Supreme Court reversed this Court's decision in Shabazz v. O'Lone, 782 F.2d 416 (1986) (in banc ), which had held unconstitutional a prison regulation that effectively prevents certain Muslim inmates from participating in a weekly religious ceremony central to the Islamic faith. The Supreme Court first found that the Turner reasonableness analysis applies whether a challenged regulation "effectively prohibit[s], rather than simply limit[s], a particular exercise of constitutional rights." O'Lone v. Estate of Shabazz, 482 U.S. ----, 107 S.Ct. 2400, 2404 n. **, 96 L.Ed.2d 282 (1987). Thus, applying that analysis, Estate of Shabazz concluded that the challenged regulation was reasonable. See 107 S.Ct. at 2405-07.
 
 
 22
 This appeal arises from the district court's order granting preliminary injunctive relief to MCCI inmates. "[O]ur review of the grant or denial of preliminary injunctions is limited to determining whether there has been an abuse of discretion, an error of law, or a clear mistake in the consideration of the proof." Moteles v. University of Pa., 730 F.2d 913, 918 (3d Cir.), cert. denied, 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984); accord Bill Blass, Ltd. v. Saz Corp., 751 F.2d 152, 154 (3d Cir.1984). On appeal, the County challenges paragraphs 1 and 5 of the district court's order and the underlying judgment as set forth in its memorandum opinion.[10] We shall consider these paragraphs in turn. In particular, we will determine whether the district court accurately applied the appropriate legal standard and properly concluded that MCCI inmates had demonstrated a "reasonable probability of eventual success in the litigation." Kershner v. Mazurkiewicz, 670 F.2d 440, 443 (3d Cir.1982).
 
 III.
 
 23
 Accommodation of the Fundamental Rights of Inmates
 
 
 24
 We begin our analysis, as we must, with the basic proposition that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner, 107 S.Ct. at 2259; accord Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) ("no iron curtain [is] drawn between the Constitution and the prisons"). "Indeed, ... [the United States Supreme Court has] insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); see, e.g., Wolff, 418 U.S. 539, 94 S.Ct. 2963 (due process protections extend to inmate disciplinary proceedings); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (retention of certain first amendment rights of free speech); Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam) (retention of first amendment rights of free exercise of religious beliefs); Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam) (protection against invidious racial discrimination proscribed by the Equal Protection Clause of the fourteenth amendment). Protection of these rights reflects our "belief that the way a society treats those who have transgressed against it is evidence of the essential character of that society." Palmer, 468 U.S. at 523-24, 104 S.Ct. at 3199.
 
 
 25
 To ensure that correctional facilities function appropriately, however, some limitation on very significant rights is justified in the prison context "both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security." Estate of Shabazz, 107 S.Ct. at 2404; accord Martinez, 416 U.S. at 412, 94 S.Ct. at 1811 ("The identifiable governmental interests at stake in th[e prison context] ... are preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners."). In assessing the validity of institutionally-imposed restrictions on prisoners' constitutional rights, the Supreme Court has recently instructed that, whether the restriction be partial or complete, a reviewing court must apply a uniform standard of review. Turner, 107 S.Ct. at 2261; cf. Estate of Shabazz, 107 S.Ct. at 2404 n. ** (rejecting argument that heightened scrutiny is appropriate "whenever regulations effectively prohibit, rather than simply limit, a particular exercise of constitutional rights"). Specifically, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 107 S.Ct. at 2261. Guided by these principles, we turn now to the challenged court-ordered release regulation of MCCI and the district court's assessment of its validity.
 
 
 26
 MCCI inmates allege that the Institution's policies constitute an unconstitutional infringement upon their right to elect to terminate their pregnancies.[11] In Roe v. Wade, the Supreme Court held that "[the] right of privacy ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. at 153, 93 S.Ct. at 727; accord City of Akron v. Akron Center for Reproductive Health, 462 U.S. 416, 419, 103 S.Ct. 2481, 2487, 76 L.Ed.2d 687 (1983) ("Akron "); Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 60, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976). More recently, the Court has specifically observed that
 
 
 27
 [f]ew decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision--with the guidance of her physician and within the limits specified in Roe --whether to end her pregnancy. A woman's right to make that choice freely is fundamental.
 
 
 28
 Thornburgh v. American College of Obstetricians, 476 U.S. 747, 772, 106 S.Ct. 2169, 2185, 90 L.Ed.2d 779 (1986). MCCI inmates contend that the County's policy, requiring pregnant inmates who want an abortion that has not been characterized by the jail physician as "medically necessary" first to obtain a court order to be released on their own recognizance, impedes their freedom safely to choose abortion and impermissibly delays the exercise of that choice.
 
 
 29
 At the outset, it is necessary to articulate our understanding of the County's policy as reflected by the record, the district court's opinion, the County's brief and the arguments of the parties before this Court. Prior to the district court's challenged order, the County's policy with respect to certain inmate-requested abortions was to require court-ordered release on the inmate's own recognizance. Under the County's current view, there are essentially two categories of medical services relevant to this appeal. First, there are those procedures that may be classified as "medically necessary," which the County concedes its obligation to provide. All inmates--regardless of their security classification--who are in need of "medically necessary" services are escorted by prison guard(s) to an appropriate medical facility for the required treatment. No court order is required for inmates to obtain "medically necessary" services. Second, there are those procedures that may be classified as "purely elective medical procedures," which the County maintains it has no obligation to insure or to provide.
 
 
 30
 With respect to inmate-requested abortions, the County asserts that "[i]t is and has been the policy in Monmouth County that if abortions are determined to be necessary, the jail physician will order that they be performed." Letter from Malcolm V. Carton, Esq. to The Hon. Harold A. Ackerman 2 (May 19, 1986), reprinted in App. at A29. Abortions not so characterized, however, are considered by the County as "purely elective and non-therapeutic," and hence beyond its obligation to provide. All inmates--again, regardless of their security status--requesting such abortions are required to submit to the court-ordered release procedure.[12] There is no indication in the record, however, that other forms of "purely elective" surgery are subject to the court-order requirement; rather, it appears to be an option created solely to address inmate requests for elective, nontherapeutic abortions.[13] In sum, then, under the County's policy, MCCI inmates' exercise of their constitutional right to elect to have an abortion is conditioned on (1) having the desired treatment characterized as medically necessary by the jail physician, or (2) obtaining a court order to be released on their own recognizance for the purpose of securing an abortion. Our task is to determine whether the district court properly concluded that these conditions impermissibly burden the inmates' exercise of their constitutional right to choose to terminate their pregnancies.[14]
 
 
 31
 Beginning with the proposition established in Roe, that a woman has a fundamental right to choose to terminate her pregnancy, the district court proceeded to determine whether the County had articulated a "compelling state interest" sufficient to justify limitation of that right in the prison context. MCCI Inmates II, 643 F.Supp. at 1222. The district court found that the "court-ordered release [requirement] unquestionably has a 'significant impact' upon ... a woman's right to choose abortion," id. at 1223, and that the County "offer[ed] no justification for this infringement on the inmates' fundamental right, let alone a compelling state interest." Id. at 1222. Relying both on the Supreme Court's decision in Martinez and this Court's in banc decision in Shabazz, the district court concluded that, "[e]ven presuming[ that] the compelling state interest supporting the county is internal security and the public safety, the county's requirement is not the least restrictive means consistent with the maintenance of prison discipline." MCCI Inmates II, 643 F.Supp. at 1223.
 
 
 32
 As noted above and following oral argument to this Court, the Supreme Court reversed our decision in Shabazz. Estate of Shabazz, 107 S.Ct. 2400. That reversal was based in part on the Court's recent opinion in Turner, which had in turn clarified the principles, first addressed in Martinez, that apply to the review of prisoners' constitutional claims. For two reasons, we conclude that the Supreme Court's recent decisions in Estate of Shabazz and Turner do not require a different result. First, in Estate of Shabazz, the Court rejected, as an improper encroachment on the judgment of prison administrators, the establishment of "a separate burden on prison officials to prove 'that no reasonable method exists by which [prisoners'] ... rights can be accommodated without creating bona fide security problems.' " Id. at 2405 (quoting Shabazz, 783 F.2d at 420). The Court did not alter, however, the well-established rule that infringement upon certain fundamental rights by governmental regulation may only be justified by a legitimate state interest. See id. at 2405 ("a regulation must have a logical connection to legitimate governmental interests invoked to justify it"). Second, and more important, under the reasonableness standard articulated in Turner and applied in Estate of Shabazz, the County's regulation is invalid.
 
 A. Legitimate Penological Interests
 
 33
 The sole governmental interest asserted by the County as justification for its policy is that unspecified,[15] yet insurmountable, administrative and financial burdens will result if the County is required to provide access to and funding for elective, nontherapeutic abortions.[16] We agree with the district court that, at the threshold, the County's articulated objection to the costs of providing MCCI inmates with abortion-related services independently fails to state a legitimate governmental interest sufficient to justify the County's policy.[17] Without regard to the economic status of individual prisoners, where conditions within a prison facility are challenged as constitutionally inadequate, courts have been reluctant to consider costs to the institution a major factor in determining whether a constitutional violation exist. See, e.g., Hamm v. DeKalb County, 774 F.2d 1567, 1573 (11th Cir.1985) ("state's interest in limiting the cost of detention ... will justify neither the complete denial of ... [food, living space, and medical care] nor the provision of those necessities below some minimally adequate level"), cert. denied, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); Wright v. Rushen, 642 F.2d 1129, 1134 (9th Cir.1981) ("costs cannot be permitted to stand in the way of eliminating conditions below Eighth Amendment standards"); Battle v. Anderson, 594 F.2d 786, 792 (10th Cir.1979) (" 'constitutional treatment of human beings confined to penal institutions ... is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries' ") (citations omitted); Newman v. Alabama, 559 F.2d 283, 286 (5th Cir.1977) ("compliance with constitutional standards may not be frustrated by legislative inaction or failure to provide the necessary funds"), cert. denied, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); Mitchell v. Untreiner, 421 F.Supp. 886, 896 (N.D.Fla.1976) (" '[l]ack of funds is not an acceptable excuse for unconstitutional conditions of incarceration' ") (citations omitted); id. at 896-97 (citing cases).
 
 
 34
 "This is not to say that economic factors may not be considered ... in choosing the methods used to provide meaningful access [to constitutionally-mandated services]. But the cost of protecting a constitutional right cannot justify its total denial." Bounds v. Smith, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977); accord Shabazz, 782 F.2d at 420 n. 3 (including costs as relevant factor to be considered in determining whether potential method of accommodation is reasonable), rev'd on other grounds, Estate of Shabazz, 107 S.Ct. 2400. In this regard, the courts have recognized that, while the Constitution does not require prison officials to adopt the best method of accommodation, the opportunity they provide inmates to exercise the asserted right must be meaningful. See Campbell v. Miller, 787 F.2d 217, 226 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); Harrell v. Keohane, 621 F.2d 1059, 1061 (10th Cir.1980); see also Patterson v. Mintzes, 717 F.2d 284, 288 (6th Cir.1983) (" '[m]eaningful' access requires writing facilities and supplies as well as legal resources"); cf. Masjid Muhammad--D.D.C. v. Keve, 479 F.Supp. 1311, 1318-19 (D.Del.1979) (Muslim inmates are entitled to a nutritious non-pork diet, but prison is not thereby obliged to provide a particular pork-free diet to them); Twyman v. Crisp, 584 F.2d 352, 359 (10th Cir.1978) (prison stamp policy constitutional because prisoners have no "unlimited right to free postage in connection with the right of access to the courts"). Thus, while economic factors may become central to fashioning an affirmative remedy for demonstrated constitutional inadequacies, such considerations ordinarily cannot justify imposition of a restrictive regulation that infringes on a constitutional right. Nor are we convinced that the alleged imposition of administrative inconvenience, unattached to any legitimate penological objective such as security, see Estate of Shabazz, 107 S.Ct. at 2406 (special scheduling of work details for Muslim inmates "would ... threaten prison security by allowing 'affinity groups' ... to flourish"), suffices to outweigh the retained fundamental rights of inmates. Cf. Carey v. Population Servs. Int'l, 431 U.S. 678, 691, 97 S.Ct. 2010, 2019, 52 L.Ed.2d 675 (1977) ("the prospect of additional administrative inconvenience has not been thought to justify invasion of fundamental constitutional rights").[18]
 
 
 35
 On the facts of this appeal, the County's policy of denying access to and funding for elective abortions cannot be justified by its asserted administrative and economic considerations. The County's court order requirement effectively deprives maximum security inmates who seek elective, nontherapeutic abortions of any opportunity to exercise their option of choosing to abort their pregnancies. This total deprivation occurs without regard to the economic status of the particular inmate desiring an elective abortion. Moreover, due to the inherent delays in the court-order procedure, which we discuss in greater detail in the "reasonableness" analysis that follows, the probability that low security risk offenders will also be effectively denied a reasonable opportunity safely to terminate their pregnancies far outweighs the County's asserted economic and administrative justifications for its policy.
 
 B. The Turner Reasonableness Test
 
 36
 Even assuming, as did the district court, that the County's policy is supported by legitimate concerns for "internal security and the public safety," MCCI Inmates II, 643 F.Supp. at 1223, it is nonetheless unreasonable under the standard articulated in Turner and, thus, invalid. Reasonableness may be determined by reference to several factors. Consideration of these factors in relation to the challenged court-ordered release requirement dictates our conclusion.
 
 1.
 
 37
 "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it.... Moreover, the governmental objective must be a legitimate and neutral one." Turner, 107 S.Ct. at 2262 (citations omitted).
 
 
 38
 We find that the County's policy is simply inexplicable in terms of legitimate security concerns. Minimum and maximum security inmates who need "medically necessary" services are not required to obtain court-ordered release in order to receive treatment. By contrast, where the medical procedure is an abortion deemed to be "elective," all inmates, regardless of their security status, must apply for a court order releasing them to obtain the desired services. The court order requirement thus centers around the nature of the treatment; it in no way relates to the gravity of any perceived security risks. As the district court found, "[a]ll other things being equal, inmates who wish to have an abortion pose no greater security risk than any other inmate who requires outside medical attention." MCCI Inmates II, 643 F.Supp. at 1223. The court-ordered release requirement is merely designed to effectuate the County's position that it is not obliged to fund elective, nontherapeutic abortions; it bears no "logical connection," Turner, 107 S.Ct. at 2262, to any perceived security risk or any other legitimate penological interest.[19] "Security is no less protected, crime is no less deterred, retribution is not undermined, and rehabilitation is not hindered by the exercise of a prisoner's right to [elect] ... an abortion." Vitale, Inmate Abortions--The Right to Government Funding Behind Prison Gates, 48 Fordham L.Rev. 550, 556 (1980). Accordingly, we conclude that the court-order requirement is "arbitrary" and "irrational" under the Turner reasonableness test.[20] 107 S.Ct. at 2262.
 
 2.
 
 39
 "A second factor relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates." Turner, 107 S.Ct. at 2262. Unlike the situations in Turner and Estate of Shabazz, where the asserted rights of free speech and religious freedom were broad enough to gain expression through means other than the proscribed activity, see Estate of Shabazz, 107 S.Ct. at 2406, a woman's fundamental right to choose abortion is both time-bound and procedure-specific. As we noted above, inmates imprisoned for serious offenses are effectively deprived of their right to elect a nontherapeutic abortion. See MCCI Inmates II, 643 F.Supp. at 1222; cf. id. at 1226 (noting under eighth amendment analysis that, for maximum security inmates, "their conditions are ... rendered 'irreparable' if they are not permitted to obtain an abortion while incarcerated pursuant to a sentence [that] exceeds the period of time in which an abortion may safely be performed"). For these inmates, court-ordered release on their own recognizance is virtually impossible, and no abortions may be performed at the prison facility. Consequently, no " 'other avenues' remain available for the exercise of the asserted right." Turner, 107 S.Ct. at 2262 (quoting Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 131, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977)).
 
 
 40
 Similarly, inmates imprisoned for less serious offenses are exposed to an unconstitutional risk of delay under the County's court-ordered release requirement and have no viable alternative available for the free and safe exercise of their choice to terminate their pregnancies. "[T]ime is likely to be of the essence in an abortion decision." H.L. v. Matheson, 450 U.S. 398, 412, 101 S.Ct. 1164, 1172, 67 L.Ed.2d 388 (1981). As a result, the Supreme Court has invalidated government-imposed delays on a woman's access to abortion services. See, e.g., Akron, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (mandatory 24-hour waiting period between decision to abort and abortion procedure unconstitutional); Thornburgh, 476 U.S. 747, 106 S.Ct. 2169 (requirement of presence of second physician during abortion procedure unconstitutional due to potential for delay in second physician's arrival). Moreover, a "plethora of cases" have "reiterated with little variation" the risks involved when delays are imposed on the abortion decision. Zbaraz v. Hartigan, 763 F.2d 1532, 1536, 1537 (7th Cir.1985) (citing cases), appeal filed, --- U.S. ----, 107 S.Ct. 267, 93 L.Ed.2d 245 (1986), supplemental briefing directed, --- U.S. ----, 107 S.Ct. 1636, 95 L.Ed.2d 208, argued, --- U.S. ----, 108 S.Ct. 479, 98 L.Ed.2d 478 (1987). As the Zbaraz court observed,
 
 
 41
 it is uncontested that delays of a week or more do indeed increase the risk of abortion to a statistically significant degree.... Furthermore, a delay of even twenty-four hours may push a woman into the second trimester, thus requiring that the operation be performed in a hospital, and significantly increasing the procedure's cost, inconvenience, and, of course risk.
 
 
 42
 763 F.2d at 1537 (quoting Women's Medical Center of Providence, Inc. v. Roberts, 530 F.Supp. 1136, 1146 (D.R.I.1982)); accord Hodgson v. Minnesota, 827 F.2d 1191, 1196-97 (8th Cir.1987) (Rosenn, J.) (statutory notice requirement and its mandatory waiting period impermissibly burden a minor's decision to abort her pregnancy); Comras v. Lewin, 183 N.J.Super. 42, 45, 443 A.2d 229, 230 (App.Div.1982) ("the enhanced risks of an abortion delayed to the second trimester are of such nature and magnitude that, even though abortion remains lawfully available, the parent is effectively 'denied a meaningful opportunity' to decide whether the fetus should be aborted") (citation omitted). In addition to the delays inherent in the court order application process,[21] an inmate, upon release, may encounter additional delays in scheduling the actual procedure. Because the court-ordered release requirement necessarily delays the implementation of the inmates' decisions to abort, fails to consider the stage of the pregnancy at the time the request for an abortion is made and constitutes the sole means, under the County's policy, by which pregnant, minimum security inmates may potentially obtain the elective, nontherapeutic abortions they desire, it is an unreasonable restriction on the inmates' fundamental right to choose abortion.
 
 3.
 
 43
 A third consideration under Turner is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." 107 S.Ct. at 2262. Included in this consideration are the expected costs of accommodating inmates' right to choose abortion. Although the district court held that the court-order requirement impermissibly burdens an inmate's exercise of her choice, it separately concluded that, because there is no constitutional right to funding for nontherapeutic abortions, the County was not obligated to appropriate funds for non-life-threatening inmate abortions. MCCI Inmates II, 643 F.Supp. at 1223-24. We do not understand the MCCI inmates, however, to be asserting a general constitutional right to publicly-funded elective, nontherapeutic abortions. Rather, they contend that inmates retain their constitutional right to elect to terminate their pregnancies, and that this right must be accommodated by MCCI officials if no legitimate, penological objective is thereby compromised. In this regard, the inmates equate MCCI's affirmative duty to accommodate those retained fundamental rights of its prisoners with an obligation to provide any funding incident to the required accommodation.
 
 
 44
 Examining the Supreme Court's decisions in Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (provision of Medicaid reimbursement for costs of medical services incident to childbirth or medically necessary abortions, but not for medical services incident to nontherapeutic abortions, constitutionally valid), Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) (state not required to fund nontherapeutic, first trimester abortions as condition precedent to participation in Medicaid program), Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (Equal Protection Clause of the fourteenth amendment not violated by statutory provision prohibiting use of Medicaid funds for abortions except in life-threatening situations for the mother or in instances of rape or incest), and Williams v. Zbaraz, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980) (statute limiting Medicaid funding for abortions to those necessary to preserve the life of the mother held constitutional), the district court concluded that "the prohibition of funds for abortions [that] are medically necessary, as well as those [that] are purely elective, is constitutionally valid. Therefore, the county's current policy [of refusing entirely to appropriate funds for elective, nontherapeutic abortions] is not violative of the federal Constitution." MCCI Inmates II, 643 F.Supp. at 1224. We are not so easily persuaded.
 
 
 45
 Whatever the government's constitutional obligations to the free world, those obligations often differ radically in the prison context. Cf. Southerland v. Thigpen, 784 F.2d 713, 716 (5th Cir.1986) (case law developed in free world context not controlling where woman asserting fundamental right to breast-feed her infant son was a prison inmate). For example, governmental provision of various items to facilitate the exercise of religious freedoms, while in some instances mandated within the prison context, see, e.g., Kahane v. Carlson, 527 F.2d 492 (2d Cir.1975) (prison officials must accommodate right of prisoners to receive diet consistent with religious scruples); Schlesinger v. Carlson, 489 F.Supp. 612 (M.D.Pa.1980) (orthodox Jewish inmate entitled to hot plate and access to room to prepare Passover meals), would undoubtedly give rise to cognizable claims under the Establishment Clause of the first amendment in the free world. In a different vein, while the government must provide prisoners in its custody with adequate food and housing, see Newman, 559 F.2d at 291, no such affirmative duty is deemed to exist as to this nation's poor and homeless. See Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972) ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill.").
 
 
 46
 Because of the very fact of incarceration, the Supreme Court has recognized that " '[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of liberty, care for himself [or herself].' " Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (citations omitted). Automatically applying in the prison context the tenets that define the government's obligation to its free world citizens denies MCCI inmates' right to have their constitutional claims balanced against the state's legitimate interests in operating its prisons. See Brown v. Johnson, 743 F.2d 408 (6th Cir.1984), cert. denied sub nom. Inosencio v. Johnson, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). Examination of the inmates' claim--that the financial burden of accommodating their retained right to choose abortions rests with MCCI--under the third element of the Turner reasonableness test leads us to the conclusion that the district court erred in concluding that no prison funds need be expended for the provision of elective, nontherapeutic abortions.
 
 
 47
 First, providing an inmate who elects to have a nontherapeutic abortion with both transportation to an appropriate medical facility and the necessary funding for the procedure will not burden "the use of the prison's limited resources." Turner, 107 S.Ct. at 2262. Indeed, such an accommodation certainly imposes no greater burdens than already exist under the County's accepted responsibility to provide all pregnant inmates with proper pre- and post-natal care.[22] See SA at 2. A pregnant woman has essentially two alternatives: she can terminate the pregnancy or carry the fetus to term. Whether a guard accompanies a pregnant inmate to an outside medical facility for the purposes of obtaining an abortion or for medical care associated with full term pregnancy, the use of a prison's limited resources is virtually the same.[23] Accommodation of the inmate's choice to terminate her pregnancy under the same terms currently available to pregnant inmates opting for childbirth will impose no more, and indeed probably less, administrative and financial burdens on MCCI officials.[24] Cf. Estate of Shabazz, 107 S.Ct. at 2406 (where extra supervision would be required to accommodate Muslim prisoners, suggested alternatives " 'would be a drain on scarce human resources' ") (citation omitted).
 
 
 48
 Second, in Estate of Shabazz, the Supreme Court noted that "perceive[d] favoritism" may result where special arrangements are made to accommodate one group. 107 S.Ct. at 2406. Here, however, MCCI inmates desiring elective abortions do not seek the "special arrangements" comparable to those requested by the Muslim inmates in Estate of Shabazz. Instead, they seek arrangements equal to those provided for other pregnant inmates choosing childbirth or requiring "medically necessary" abortions. Although the Supreme Court has recognized that a state has a legitimate and important interest in encouraging natural childbirth over abortion, see Maher, 432 U.S. at 474, 97 S.Ct. at 2382; Beal, 432 U.S. at 445, 97 S.Ct. at 2371, the County has not asserted, and we cannot conceive of, a legitimate penological interest that would be furthered by its policy so characterized.[25] Specifically, encouraging childbirth in the prison context furthers none of the traditionally recognized penological objectives of rehabilitation,[26] internal security or deterrence of crime. Moreover, as the district court noted, the provision of abortions in state and federal facilities without distinguishing between "elective" and "medically necessary" procedure renders dubious both the inconsistent treatment of abortion requests at the various levels in governmental institutions and any alleged penological objective justifying discriminating between inmates opting for childbirth and those electing to terminate their pregnancies. See MCCI Inmates II, 643 F.Supp. at 1223 & n. 4; id. at 1227 & n. 9.
 
 
 49
 We simply perceive no "significant 'ripple effect' on fellow inmates or on prison staff," Turner, 107 S.Ct. at 2262, that would be caused by providing medical services to inmates choosing abortion equal or comparable to those provided to inmates electing childbirth. Nor has any reason been suggested why, in terms of costs, a prison's obligation to accommodate the retained right of the inmate to choose abortion should be treated any differently from its obligation to accommodate other fundamental rights, such as access to the courts or free exercise of religion. In those contexts, prison funds are routinely expended to facilitate the meaningful exercise of the asserted right.
 
 
 50
 Having said this much, we caution that our rejection of the district court's conclusion that the County is under no obligation to appropriate funds for elective abortions does not impose on the County an affirmative obligation to do so. Prison officials have broad discretion in fashioning appropriate responses to legitimate penological objectives consistent with the constitutional rights of its inmates. Where accommodation of constitutional rights is required, prison officials "bear the burden of demonstrating the adequacy of the means they choose." Campbell, 787 F.2d at 226. Under the fundamental rights analysis, elimination of the court-ordered release requirement in conjunction with the provision of alternative means of accommodating inmate requests for elective abortions is constitutionally sound, and such accommodation may not require expenditure of prison funds for payment of the actual abortion procedure.[27] In other words, the County's obligation to accommodate the rights of its prisoners attaches notwithstanding their indigency or wealth. The question whether the County may constitutionally institute a means-based accommodation of the inmates' right to choose to terminate their pregnancies is, at this juncture, premature. That adequate means to accommodate the inmates' meaningful exercise of their right to choose abortion must be provided, however, is clear. To the extent that the district court's conclusion absolutely relieves the County of the burden of expending any funds to subsidize or to assume fully the costs of the abortion procedure in accommodating the inmates' asserted right, it is in error.
 
 4.
 
 51
 The final aspect of the Turner reasonableness test advises that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." 107 S.Ct. at 2262 (citations omitted). Accordingly, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimus cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. MCCI inmates seek provision of all medical services related to their pregnancies--including abortion-related services--on the same terms that medical services are currently provided to pregnant inmates who opt to give birth. As indicated above, we perceive no significant disruption of valid penological interests that would accompany the provision of the requested services. The County's policy thus represents an "exaggerated response" to its asserted financial and administrative concerns and to its presumed security concerns. It also bears no "logical connection" to the traditionally recognized penological objectives of rehabilitation or deterrence of crime, and is thus unreasonable.
 
 IV.
 
 52
 Eighth Amendment Obligation to Provide Adequate Medical Care
 
 
 53
 MCCI inmates also argue that, independent of the County's obligation to accommodate the retained fundamental rights of its prisoners, MCCI has an affirmative duty to attend to the serious medical needs of the wards in its custody and that denial of elective abortions to its inmates constitutes a breach of that duty in contravention of the eighth amendment. Conversely, the County suggests that, even absent a court order requirement or any other regulation that allegedly burdens the inmate's right to choose freely to terminate her pregnancy, it bears no financial responsibility for provision of treatment that is not medically necessary.[28] See Brief of Appellants at 8. By definition, then, the County claims that providing elective, nontherapeutic abortions is beyond the scope of its duty. The County likens its responsibility to an inmate who requests such an abortion to its responsibility to "an inmate who desires a facelift or the removal of varicose veins for purely cosmetic reasons...."[29] Id. at 13.
 
 
 54
 Relying on Derrickson v. Keve, 390 F.Supp. 905 (D.Del.1975) and West v. Keve, 571 F.2d 158 (3d Cir.1978), the district court analogized inmates incarcerated for maximum security offenses who cannot gain release through the County's court-ordered release procedure to the "lifer" in Derrickson who was denied recommended elective surgery for treatment of a severe sinus condition. See MCCI Inmates II, 643 F.Supp. at 1226. The district court recognized that, for those high security risk offenders whose terms of incarceration will exceed the period of time during which abortions can be performed safely, "their conditions are ... rendered 'irreparable' " by the denial of the requested services.[30] Id. Put otherwise, denial to inmates of services necessary to exercise their right to chose an abortion results in the loss of the right to choose altogether. Cf. Derrickson, 390 F.Supp. at 907 ("The surgery, then is not elective. Unless Defendants act, it is impossible."). Such denial for these inmates constitutes a violation of the eighth amendment.
 
 
 55
 Similarly, as to low security risk offenders, the district court found that these inmates, although eligible for release under the court order procedure, are totally dependent on prison authorities for the provision of needed medical care. By virtue of their incarceration, they are deprived of "outside resources, such as gainful employment and Medicaid coverage," to cover the costs of elective abortions even in the event of their release. MCCI Inmates II, 643 F.Supp. at 1227. Recognizing both the inmates' fundamental right to choose abortion and the County's obligation to attend to the serious medical needs of its inmates, the district court concluded that
 
 
 56
 [p]ermitting pregnant inmates to exercise their right to choose [to terminate their pregnancies] and then to carry through with that decision is in no way inconsistent with their status as prisoners or with the goals of the correctional system. Additionally, the prisons should be and are constitutionally required to provide for [i.e., at the institution's expense,] all the serious medical needs of the inmates, whose imposed financial dependency is ... a result of their incarceration.
 
 
 57
 Id.
 
 
 58
 On appeal, the County challenges the district court's characterization of an elective, nontherapeutic abortion as a "serious medical need" and its conclusion that the eighth amendment, in conjunction with the fourteenth amendment, requires that the County assume the full costs of inmate-requested elective abortions. Because we believe that the district court properly concluded that MCCI inmates demonstrated a likelihood of success on their eighth amendment claim that denial of abortion-related services constitutes deliberate indifference to a serious medical need, we will affirm its judgment requiring the County to provide abortion services to all inmates requesting such service. Because we find, however, that substantial questions remain as to the proper allocation of the costs for the provision of such services, we will modify paragraph 5 of the district court's order requiring that the County assume the full cost of all inmate abortions, see MCCI Inmates II, 643 F.Supp. at 1229, consistent with the views set forth below.A. Deliberate Indifference to Serious Medical Need
 
 
 59
 In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court declared that, in accordance with the " 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' " embodied in the eighth amendment, id. at 102, 97 S.Ct. at 290 (citations omitted), the government is obliged "to provide medical care for those whom it is punishing by incarceration."[31] Id. at 103, 97 S.Ct. at 290. Recognizing that "[a]n inmate must rely on prison authorities to treat his [or her] medical needs[, and that] if the authorities fail to do so, those needs will not be met," id., the Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Id. at 104, 97 S.Ct. at 291 (citations omitted). The standard enunciated in Estelle is two-pronged: "[i]t requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious." West, 571 F.2d at 161.
 
 
 60
 Courts, determining what constitutes deliberate indifference, have consistently held that mere allegations of malpractice do not raise issues of constitutional import. See e.g., Estelle, 429 U.S. at 106 & n. 14, 97 S.Ct. at 292 & n. 14; Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir.1970) ("More is needed than a naked averment that a tort was committed under color of state law...."). Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation. See Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir.1977); Massey v. Hutto, 545 F.2d 45, 46 (8th Cir.1976) (per curiam).
 
 
 61
 Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate "to undue suffering or the threat of tangible residual injury," Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir.1976) (cited with approval in Estelle, 429 U.S. at 105 n. 11, 97 S.Ct. at 291 n. 11), deliberate indifference is manifest. Similarly, where "knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care," Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir.1985), the deliberate indifference standard has been met. See Robinson v. Moreland, 655 F.2d 887, 889-90 (8th Cir.1981) (jury could properly conclude that provision of ice-pack for inmate's fractured hand constituted deliberate indifference where prison guard knew medical care was needed). Short of absolute denial, "if necessary medical treatment [i]s ... delayed for non-medical reasons, a case of deliberate indifference has been made out." Ancata, 769 F.2d at 704; accord Archer v. Dutcher, 733 F.2d 14 (2d Cir.1984) (allegation that emergency medical care to pregnant inmate was delayed in order to make her suffer states a claim of deliberate indifference under Estelle ). Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that "result[ ] in interminable delays and outright denials of medical care to suffering inmates." Todaro v. Ward, 565 F.2d 48, 53 (2d Cir.1977). Prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for " 'an easier and less efficacious treatment' " of the inmate's condition. West, 571 F.2d at 162 (citations omitted). Nor may they condition provision of needed medical services on the inmate's ability or willingness to pay. See Ancata, 769 F.2d at 704; cf. City of Revere, 463 U.S. 239, 245, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (right to treatment constitutionally mandated regardless of who pays for treatment). Finally, deliberate indifference is demonstrated "[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to physician capable of evaluating the need for such treatment." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979).
 
 
 62
 A medical need is "serious," in satisfaction of the second prong of the Estelle test, if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Pace v. Fauver, 479 F.Supp. 456, 458 (D.N.J.1979), aff'd, 649 F.2d 860 (3d Cir.1981); accord Laaman v. Helgemoe, 437 F.Supp. 269, 311 (D.N.H.1977). The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment. For instance, Estelle makes clear that if "unnecessary and wanton infliction of pain," 429 U.S. at 103, 97 S.Ct. at 290, results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment. See id. at 105, 97 S.Ct. at 291. In addition, where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious. See, e.g., Archer, 733 F.2d at 16 (pregnant inmate who miscarried stated cognizable claim where she alleged that defendants intentionally delayed emergency medical aid in order to make her suffer); Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir.1980) (delay in providing oral surgery resulted in "continued and unnecessary pain and loss of teeth"), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); Laaman, 437 F.Supp. at 312 (denial of treatment may result in permanent damage or require corrective surgery); Derrickson, 390 F.Supp. at 907 (failure to perform elective surgery on inmate serving life sentence would result in permanent denial of medical treatment and would render inmate's condition irreparable).
 
 1.
 
 63
 In the instant appeal, we find that the MCCI inmates have met their burden of demonstrating a probability of ultimate success under Estelle. First, the deliberate indifference of MCCI officials toward the medical needs of inmates exercising their constitutionally protected right to choose abortion is evidenced by the burdensome court-ordered release procedure erected as a precondition to the exercise of that choice. Notwithstanding their period of gestation, pregnant inmates desiring elective abortions must submit to this process, which is burdened with delays. See supra Part III. The failure of MCCI officials even to attempt to minimize the delay in access to abortion services constitutes deliberate indifference to the medical needs of inmates electing to terminate their pregnancies. Indeed, by specifically categorizing elective abortions as beyond its duty to provide, the County denies to a class of inmates the type of individualized treatment normally associated with the provision of adequate medical care.[32]2.
 
 
 64
 Of course, the deliberate indifference of prison officials under Estelle violates the eighth amendment only if it is directed toward a "serious medical need." The County, in effect, maintains that elective, nontherapeutic abortions do not fall within this category because denial of such care does not "deprive[ the inmate] of medical care [that] would relieve pain being suffered as a consequence of an abnormal medical condition." Brief of Appellants at 13. Similarly, Judge Mansmann suggests that denials of elective, nontherapeutic abortions does not "equate[ ] to painful disease or injury per se." Concurring op. at 354. The County and the concurrence misperceive both the nature of the underlying need and the anticipated harm required to meet the Estelle standard.
 
 
 65
 Pregnancy is unique. There is no other medical condition known to this Court that involves at the threshold an election of options that thereafter determines the nature of the necessary medical care. In other words, the condition of pregnancy, unlike cancer, a broken arm or a dental cavity, will require very separate and distinct medical treatment depending upon the option--childbirth or abortion--that the woman elects to pursue.[33] The County's suggestion that, to come within the purview of Estelle, an inmate must suffer from "an abnormal medical condition,"[34] is simply wrong. That pregnancy itself is not an "abnormal medical condition" requiring remedial, medical attention does not place it beyond the reach of Estelle. Nor does the fact that pregnancy presents a woman with the alternatives of childbirth or abortion affect the legal characterization of the nature of the medical treatment necessary to pursue either alternative.
 
 
 66
 Here, the relevant medical care is that necessary to effectuate the inmates' choices to terminate their pregnancies. We find that the MCCI inmates have firmly demonstrated the seriousness of the needed medical care. In Estelle, the Court recognized that an inmate need not suffer "physical 'torture or a lingering death,' " 429 U.S. at 103, 97 S.Ct. at 290 (quoting In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890)), as the result of a prison's denial of medical treatment in order to come under the protections of the eighth amendment. Rather, "denial of medical care ... result[ing] in pain and suffering [that] no one suggests ... serve[s] any penological purpose ... is inconsistent with contemporary standards of decency," id., and thus violates the eighth amendment. As we have already indicated in Part III, denial of abortion-related services to MCCI inmates serves no legitimate penological purpose. More important, however, the "objective indicia," Concurring op. at 354, reflected in the relevant case law and the eighth amendment's "broad and idealistic concepts of dignity, civilized standards, humanity and decency," support our conclusion that the services required to terminate safely an inmate's pregnancy are indeed serious.
 
 
 67
 The choice to terminate one's pregnancy is constitutionally protected. Roe, 410 U.S. 113, 93 S.Ct. 705. MCCI inmates argue that services that are indispensable to the exercise of a fundamental right are "serious." See Brief of MCCI Inmates at 33. In more practical terms, the seriousness of the medical care needed to terminate a pregnancy--notwithstanding the fact that the choice to do so is constitutionally protected--is evidenced by the effect of the denial of such care.
 
 
 68
 The detriment that the State would impose upon the pregnant woman by denying her this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with an unwanted child, and there is the problem of bringing a child into a family already unstable, psychologically and otherwise, to care for it. In other cases, ... the additional difficulties and continuing stigma of unwed motherhood may be involved.
 
 
 69
 Roe, 410 U.S. at 153, 93 S.Ct. at 727; accord ACLU/APHA Brief at 33-35 (noting the increase in risk of death, physical discomforts and psychological consequences of adoption on woman who gives birth); but see Concurring op. at 355 (concluding that, notwithstanding potential injuries, denial of elective abortions does not meet the Estelle "serious medical needs" test). These effects, recognized by the Supreme Court in Roe, are most likely exacerbated when the mother is incarcerated. See generally N.J.A.C. Brief; see also Brief of MCCI Inmates at 35 (discussing consequences for an inmate who remains incarcerated after childbirth).
 
 
 70
 In sum, it is evident that a woman exercising her fundamental right to choose to terminate her pregnancy requires medical care to effectuate that choice. Denial of the required care will likely result in tangible harm to the inmate who wishes to terminate her pregnancy. Characterization of the treatment necessary for the safe termination of an inmate's pregnancy as "elective" is of little or no consequence in the context of the Estelle "serious medical needs" formulation. An elective, nontherapeutic abortion may nonetheless constitute a "serious medical need" where denial or undue delay in provision of the procedure will render the inmate's condition "irreparable." Recognition of elective nontherapeutic abortions as "serious medical needs" under Estelle in no way negates or obscures the ethical, moral and spiritual questions raised and considered by Roe and its progeny in recognizing and reaffirming the woman's constitutionally protected right to choose abortion. Unlike the concurrence, see Concurring op. at 354-55, we are unwilling to conclude as jurists that the unexplained denial of that right, or any other constitutionally protected right, is "[un]likely to offend societal standards of decency." Id. at 355. Moreover, notwithstanding the constitutional status of the right to choose abortion, we independently conclude that the inmates have carried their burden of establishing that the categorical denial of elective, nontherapeutic abortions constitutes deliberate indifference to serious medical needs under both prongs of Estelle.
 
 
 71
 B. Appropriation of Funds for Elective Abortions
 
 
 72
 The final question before us is whether the district court properly concluded that MCCI inmates demonstrated a likelihood of success on the merits of their claim that, under the eighth amendment, the County must assume the full costs of all inmate-requested abortions. The district court's judgment that the County is required to pay for all inmate abortions was based upon the "imposed financial dependency" of the inmates by virtue of their incarceration. MCCI Inmates II, 643 F.Supp. at 1227. On appeal, MCCI inmates similarly argue that "when a government incarcerates, it must ensure payment for the costs of tending to its prisoners' needs." Brief of MCCI Inmates at 37.
 
 
 73
 As to sentenced prisoners, MCCI inmates' argument is not without merit. As recognized by the Court in Estelle, "[a]n inmate must rely on prison authorities to treat his [or her] medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S. at 103, 97 S.Ct. at 290. In consequence, "[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his [or her] liberty, care for himself [or herself]." Id. at 104, 97 S.Ct. at 291 (footnote omitted). Thus, whatever the economic status of individual inmates, Estelle makes clear that there is a general obligation on the government to provide certain medical services for inmates in its custody. Moreover, the social and economic disabilities that attach upon conviction and sentencing to the already indigent inmate are far more substantial--both in terms of duration and extent[35]--than those experienced by detainees. As a result, the government's financial obligations for its wards in custody may correspond to the relative deprivation imposed upon each class of inmates, which depends upon the nature of their imprisonment. The government's eighth amendment obligations to sentenced inmates, in other words, may require the concomitant expenditure of public funds to meet those obligations.[36]
 
 
 74
 In City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983), however, the Supreme Court considered whether a government's duty, under the Due Process Clause of the fourteenth amendment, to provide necessary medical care to injured pretrial detainees includes a corresponding duty to compensate the provider of that care. Noting that it "need not define ... [the government's] due process obligation to pretrial detainees or to other persons in its care who require medical attention," id. at 244, 103 S.Ct. at 2983, the Court concluded that the question of costs "is not a federal constitutional question." Id. at 245-46, 103 S.Ct. at 2984.
 
 
 75
 [A]s long as the governmental entity ensures that the medical care needed is in fact provided, the Constitution does not dictate how the cost of that care should be allocated as between the entity and the provider of the care. That is a matter of state law.
 
 
 76
 If of course, the governmental entity can obtain the medical care needed for a detainee only by paying for it, then it must pay.
 
 
 77
 Id. at 245, 103 S.Ct. at 2983.
 
 
 78
 In directing that the County assume the full costs of all inmate abortions, the district court implicitly concluded that the financial responsibility of providing adequate medical care to sentenced inmates constitutes a constitutional question under the eighth amendment. There is no indication in the record, however, that the district court considered or distinguished City of Revere. We decline MCCI inmates' invitation to consider this issue for the first time on appeal of the district court's grant of preliminary injunctive relief. Instead, we think it clear that MCCI may not condition the provision of those needed medical services that it has an affirmative duty to ensure and provide upon the inmates' ability and/or their willingness to pay. See City of Revere, 463 U.S. at 244-45, 103 S.Ct. at 2983-84; see also Ancata, 769 F.2d at 705 ("The County is responsible for insuring that adequate funds are provided to meet the medical needs of inmates."). In addition, in the absence of alternative methods of funding, the County must assume the cost of providing its inmates with needed medical care. City of Revere, 463 U.S. at 245, 103 S.Ct. at 2983. Accordingly, paragraph 5 of the district court's order shall be modified to provide as follows:
 
 
 79
 5. County defendants shall assume responsibility for insuring the availability of funding for all inmate abortions. If alternative means of funding are nonexistent, the County must assume the full cost of all inmate abortions.
 
 V.
 Summary
 
 80
 We find that the preliminary injunction, as modified by this opinion, was properly entered. Specifically, with regard to MCCI's obligation to accommodate the retained fundamental rights of its prisoners, we concur in the district court's conclusion that the County's policy of requiring court-ordered releases for inmates to obtain nontherapeutic, elective abortions impermissibly burdens the inmates' constitutionally protected right to choose to terminate their pregnancies. Under Turner v. Safley, the court-ordered release requirement (1) bears no logical connection to any legitimate penological interest; (2) deprives inmates electing to terminate their pregnancies of alternative means of exercising their right; and (3) constitutes an exaggerated response to the County's asserted financial and administrative concerns. In addition under Turner, the accommodation of the inmates' retained fundamental right to choose abortion will impose no additional burden on the use of the prison's limited resources. The determination in the first instance of the means to accommodate the inmates' retained right is, however, a matter for the prison authorities. The issue whether such accommodation requires the expenditure of public funds is not ripe or resolvable on this appeal.
 
 
 81
 With regard to MCCI's eighth amendment obligation to provide needed medical care for wards in its custody, we find that the County's policy constitutes a deliberate indifference to the serious medical needs of MCCI inmates who opt for abortion. That policy imposes impermissible barriers to access to needed medical care for inmates who choose to terminate their pregnancies. At a minimum, MCCI's affirmative duty requires that it insure that needed medical care is in fact obtained. Accordingly, MCCI may not condition the provision of services for an elective, nontherapeutic abortion upon burdensome procedures or upon the inmates' ability or willingness to pay. Moreover, in the absence of alternative methods of funding, the County must assume the cost of providing inmates with elective, nontherapeutic abortions. The question whether the eighth amendment imposes an affirmative separate or concomitant financial obligation on the County to pay for the serious medical needs of its sentenced inmates, including nontherapeutic, elective abortions, is left to the district court.
 
 VI.
 Conclusion
 
 82
 For the foregoing reasons, the judgment and order of the district court granting appellees' motion for preliminary injunction will be affirmed in part and modified in part. Specifically, paragraph 1 of the district court will be affirmed. Paragraphs 4 and 5 will be modified to read as follows:
 
 
 83
 4. County defendants are not obligated to make arrangements for the abortion procedure, but they shall provide the necessary transportation to an appropriate medical facility for those inmates seeking an abortion, as soon as practicable following the inmate's decision to terminate the pregnancy.
 
 
 84
 5. County defendants shall assume responsibility for insuring the availability of funding for all inmate abortions. If alternative means of funding are nonexistent, the County must assume the full cost of all inmate abortions.
 
 
 85
 The remaining uncontested paragraphs of the district court's order will be affirmed.
 
 
 86
 Costs taxed against appellant.
 
 
 87
 MANSMANN, Circuit Judge, concurring.
 
 
 88
 I believe that the panel majority's opinion sweeps too broadly in upholding the preliminary injunction under consideration here. Judge Higginbotham's fluent and forceful rhetoric tends to obscure the extreme difficulty of the substantial questions of law and policy posed by this case. Determining whether the appropriate preliminary relief has been ordered necessitates intricate distinctions in the balancing of legitimate concerns. I join the majority in holding that the plaintiffs are likely to succeed on their claim under the Fourteenth Amendment; however, I believe the majority goes too far in treating that likelihood as a virtual certainty based on the limited record compiled upon consideration of a preliminary injunction. I am also not prepared, based on the information now before us, to join the panel majority in extending the protection of the Eighth Amendment to elective, medically unnecessary abortions.
 
 
 89
 The Supreme Court has found in the Fourteenth Amendment a qualified right of women to choose to abort a pregnancy. Roe v. Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 727, 35 L.Ed.2d 147, reh'g denied, 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973). As an intermediate appellate court, we do not write on a clean slate. Instead we are bound by the Roe decision and thus must apply constitutional standards to the regulation challenged here. See American College of Obstetricians v. Thornburgh, 737 F.2d 283, 317 (3d Cir.1984) (Statement of Judge Weis Sur Petition for Rehearing), affirmed, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986). In doing so, we must recognize that prisoners retain, and must be afforded a reasonable opportunity to exercise, those constitutional rights of general application which are not inconsistent with their status as prisoners or with legitimate penological objectives of the corrections system. Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984).
 
 
 90
 I believe it is incorrect to characterize the regulation under consideration as one impinging upon the exercise of a constitutional right. The majority has reached the conclusion, based upon an asserted absence of evidence that court-ordered release is required for other forms of "purely elective" surgery, that the court-ordered release requirement was developed "solely to address inmate requests for elective, nontherapeutic abortions." I do not think such a conclusion is justified based upon the absence of evidence favorable to the defendants in a preliminary injunction proceeding where the plaintiffs have the burden of proof.
 
 
 91
 Moreover, even if we assume that the regulation does single out elective abortion for treatment different from that afforded other forms of elective medical treatment, it does not follow from that assumption that the regulation is constitutionally infirm. It is incarceration that impinges upon the choice to abort a pregnancy, not a regulation providing for court-ordered release on one's own recognizance. There is no evidence whatsoever that prisoners are ever released on their own recognizance without a court order in order to obtain other forms of elective medical treatment or for any other purpose. Therefore, as the majority agrees, the regulation may fairly be seen as an affirmative attempt to accommodate the constitutionally protected choice.
 
 
 92
 The county asserts that security concerns underlie the challenged regulation. I do not think that, by enjoining enforcement of the regulation, the majority means to suggest that requiring a court order for release on the prisoner's own recognizance represents an irrational response to legitimate security concerns.
 
 
 93
 What is really at issue is whether, as the county argues, the regulation under consideration "afford[s] a reasonable opportunity" for inmates to exercise their fundamental right to choose abortion, Id. The inmates argue that a reasonable opportunity can only be afforded by imposing on the county an affirmative federal constitutional duty to expend resources to provide inmates with assistance in exercising that right. See e.g., Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).
 
 
 94
 No argument has been made that retention of the right to choose abortion is inconsistent with the inmates' status as prisoners or with the legitimate penological objectives of the corrections system. Therefore, the right is presumptively retained by the inmates, and the Turner rationale is useful to assess the constitutionality of the absence or insufficiency of regulations providing for the exercise of that right. Turner v. Safley, --- U.S. ----, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("Turner ").
 
 
 95
 The first Turner factor, that the regulations have a logical connection to legitimate governmental interests invoked to justify it, is satisfied by the county's assertion of security concerns. Under Turner it is also relevant in assessing the reasonableness of a regulation to determine whether "alternative methods of exercising the right ... remain open to prison inmates." Id. at 2262. The record suggests that release on one's own recognizance is the only method of obtaining an elective abortion. Therefore, there is apparently no opportunity for those who are not in a position to obtain a court-ordered release to exercise their right. In addition, there is apparently no procedure for expediting an application for court-ordered release in order to avoid increasing the risk of unavailability and danger from abortion.
 
 
 96
 Prison officials have no burden to disprove the availability of alternative methods of accommodating the claimant's constitutional complaint. O'Lone v. Estate of Shabazz, --- U.S. ----, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987) ("Shabazz "). However, the availability of an alternate procedure permitting the exercise of the right at de minimis burden is evidence that present regulations are too restrictive. Turner, 107 S.Ct. at 2262.
 
 
 97
 The evidence suggests that there is an "obvious, easy alternative[ ]" to the policy adopted by the county. Shabazz, 107 S.Ct. at 2407. The prison doctor, under circumstances of medical necessity, orders abortions to be performed on inmates of all security classifications. The process already in place for ordering medically-necessary abortions could also provide abortions for other inmates who request them.
 
 
 98
 I agree with the majority that, in view of the fact that no alternative procedure currently is available to expedite the court-order process or to provide those who are unable to obtain court-ordered release with a meaningful opportunity to choose to abort a pregnancy, and that a less restrictive means of accommodating the security concerns exists, the plaintiffs are likely to succeed in a claim that the challenged regulation represents an exaggerated response to security concerns.
 
 
 99
 I also agree that an assertion that economic dependency imposed by incarceration may deprive an inmate of the ability to choose abortion finds no justification under current Supreme Court law or in legitimate penological concerns. Economic factors may be considered in choosing the methods used to provide a meaningful opportunity, but the cost of protecting a constitutional right cannot justify its total denial. Bounds v. Smith, 430 U.S. at 825, 97 S.Ct. at 1496.
 
 
 100
 I agree that the inmates are likely to succeed on their claim that some affirmative assistance from the county is necessary to ensure a meaningful opportunity to obtain the medical assistance necessary to effectuate the choice protected by the Fourteenth Amendment. I stop short, however, of adopting the majority's blanket assumption that the Eighth Amendment is also implicated merely because abortion is a medical procedure. Specifically I am unwilling to join what amounts to a quantum leap to the conclusion that a state's refusal affirmatively to provide elective abortions to female prisoners constitutes cruel and unusual punishment. I believe the majority loses sight of the rationale supporting the Eighth Amendment right to medical treatment.
 
 
 101
 Certain conduct directed towards prisoners may be deemed cruel and unusual punishment because it involves the "unnecessary and wanton infliction of pain" or is "repugnant to the conscience of mankind" or can be said to offend "evolving standards of decency that mark the progress of a maturing society." Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The test of "cruel and unusual" is a strict one which considers whether the infliction grossly exceeds a legitimate need for force or violates the standards of contemporary society. Rhodes v. Robinson, 612 F.2d 766 (3d Cir.1979). The question is not whether particular conduct may be personally repugnant to the court, but whether such treatment implicates "broad and idealistic concepts of dignity, civilized standards, humanity and decency." Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) ("Estelle ").
 
 
 102
 A limited right of prisoners to medical treatment stems from an interpretation of the language of the Eighth Amendment "in light of the evolving standards of decency that mark the progress of a maturing society." Id. at 102, 97 S.Ct. at 290. The Eighth Amendment does not protect all medical needs. The essential test under the Eighth Amendment is one of medical necessity, not simply that which may be considered desirable. Id. Prisoners must not be forced to endure needless suffering from the painful and untreated effects of an accident or serious illness. Id. at 105, 97 S.Ct. at 291. In a case involving denial of medical care, the facts of each case are of controlling significance in determining whether there has been a constitutional violation.
 
 
 103
 We deal here with an asserted duty affirmatively to provide elective, medically unnecessary abortions. Although physical and psychological ills may accompany the condition of pregnancy, the record does not demonstrate that the desire of the plaintiffs to obtain an elective abortion necessarily equates to painful disease or injury per se.
 
 
 104
 Assessment of contemporary values concerning the challenged treatment of a prisoner is relevant to the application of the Eighth Amendment. Assessment of those standards with respect to the denial of elective abortions requires us to determine legislative facts concerning whether denial of elective abortions is likely to offend societal standards of decency. See In Re Asbestos Litigation, 829 F.2d 1233, 1248 (3d Cir.1987) (Becker, J. concurring). Such assessment does not call for a subjective judgment but rather requires the court to look to the objective indicia which reflect a public attitude toward a given course of conduct. Estelle, 429 U.S. at 103, 97 S.Ct. at 290 (Contemporary legislation codifies the common law view that the public should be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself).
 
 
 105
 We have nothing before us to inform our judgment in that regard. The parties have not taken the opportunity to comment on the implications from representative modern legislation, for example, nor has the issue been litigated in prior proceedings. See In re Asbestos, at 1248. In relying simply upon unsupported assumptions, the majority reasons more as advocates than as impartial judicial officers.
 
 
 106
 The right to elect to abort a pregnancy is one which the Supreme Court has acknowledged to be repugnant to the religious conscience of many. In Roe v. Wade the Supreme Court noted that "those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus" as to a theory of life to support or contravene a woman's right to choose an abortion. 410 U.S. at 159, 93 S.Ct. at 730. Justice Blackmun writing for the court stated: "We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires." Id. at 116, 93 S.Ct. at 708. "[A]bortion raises moral and spiritual questions over which honorable persons can disagree sincerely and profoundly." Thornburgh v. American College of Obstetricians, 476 U.S. 747, 772, 106 S.Ct. 2169, 2184, 90 L.Ed.2d 779 (1986).
 
 
 107
 While such disagreements do not relieve us of our duty to apply the Constitution faithfully, id., certainly no record has been compiled which would justify this court in characterizing denial of an elective abortion as repugnant to the conscience of mankind. Nor does the denial of an elective abortion become the deliberate infliction of pain simply because medical attention is necessary to effectuation of a constitutionally protected choice. Unless we decide that the Eighth Amendment is an umbrella protecting inmates from deprivation of all rights which are guaranteed by other sections of the Constitution, as in other cases involving medical treatment, whether the abortion was a "serious medical need" would be determined by the facts of each case.
 
 
 108
 The Eighth Amendment must draw its meaning from the evolving standards of decency which mark the progress of a maturing society. We have nothing before us to inform our judgment that denial of elective abortions is likely to offend societal standards of decency. Without bootstrapping the liberty interest protected by the Fourteenth Amendment into the Eighth we have no reason to decide that prisoners would be entitled to elective abortions based upon an assumption of a commonly perceived inhumanity of refusing to provide elective abortions as a general matter. This is the rationale of the Eighth Amendment and we have been given no reason to believe that it is appropriately applied to the medical procedure of elective abortion.
 
 
 109
 I agree that under current law a Fourteenth Amendment right of access by prisoners to medical care for abortion as well as for prenatal care is necessitated for a meaningful opportunity to exercise choice. Therefore, I would affirm the grant of a preliminary injunction based on the likelihood of success on the Fourteenth Amendment claim. I would pass the Eighth Amendment claim without intimating an opinion on it so that essential facts may be determined before we pass upon this novel constitutional issue.
 
 
 
 [1]
 The defendants in the underlying actions will be collectively referred to as "the County" throughout this opinion
 
 
 [2]
 Specifically, the district court ordered the Institution to make certain renovations to the jail, to provide a daily recreation program, to supply appropriate beds and bedding for all inmates, to develop and implement a meaningful classification system, to increase visiting hours, to hire an additional nurse, to perform medical examinations of all inmates prior to their release into the general population and to maintain a prison population of no more than 344 inmates. See Monmouth County Correctional Inst. Inmates v. Lanzaro, 595 F.Supp. 1417 (D.N.J.1984)
 
 
 [3]
 Pursuant to the Consent Judgment, the County agreed (1) to establish and implement procedures for pregnancy testing of all female inmates upon admission to the Institution; (2) to ensure prenatal care at an appropriate maternity clinic outside the correctional facility; (3) to provide all treatment and medication prescribed by the treating clinic; (4) to provide all female inmates twenty-four hour access to toilet facilities; and (5) to provide prenatal vitamins, milk and juice to all pregnant inmates upon request. See SA at 2-3
 
 
 [4]
 On appeal, the County has modified its characterization of its policy to permit all "medically necessary" abortions, thereby including those that endanger the health as well as the life of the mother. See Brief of Appellant at 8 & n. 1
 
 
 [5]
 Jane Doe and Mary Smith are, of course, pseudonyms
 
 
 [6]
 In support of its position, the County relied upon N.J.Admin.Code tit. 10A, Sec. 31-3.15(a) (1979), quoted in Monmouth County Correctional Inst. Inmates v. Lanzaro, 643 F.Supp. 1217, 1221 n. 3 (D.N.J.1986) ("MCCI Inmates II "), which provides that,
 [d]uring the period of confinement, the inmate is a ward of the county and concern shall be shown for both his [or her] physical and mental well-being. While it would be unrealistic to burden the county jail with responsibility for all the inmates' health needs, essential medical, dental, and health service care shall be provided.
 N.J.Admin.Code tit. 10A, Sec. 31-3.15(a) (1979).
 
 
 [7]
 Those abortions deemed necessary to protect the life or health of the mother are classified as "medically necessary." In determining which abortions meet this classification, the district court instructed that the County be guided by the regulations of the New Jersey Department of Human Services, see MCCI Inmates II, 643 F.Supp. at 1225, which provide in pertinent part:
 (b) A physician may take the following factors into consideration in determining whether an abortion is medically necessary:
 
 
 [1]
 Physical, emotional, and psychological factors;
 
 
 [2]
 Family reasons;
 
 
 [3]
 Age
 N.J.Admin.Code tit. 10B, Sec. 53-1.14 (1984). This holding is not challenged on appeal.
 
 
 [8]
 In Estelle, the Supreme Court held that, "[i]n order to state a cognizable claim [under the eighth amendment], a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 429 U.S. at 106, 97 S.Ct. at 292
 
 
 [9]
 Applying this analysis to the regulation of inmate-to-inmate correspondence, the Turner Court concluded that that regulation was "reasonably related to legitimate security interests" and thus, was valid. 107 S.Ct. at 2262-63. With respect to the marriage regulation, however, the Court concluded that the regulation represented an "exaggerated response to ... rehabilitation and security concerns." Id. at 2263
 
 
 [10]
 In its brief before this Court, the County maintained that its "appeal is focused exclusively upon the District Court's interpretation of the Eighth Amendment insofar as it applies to elective, nontherap[e]utic abortions." Brief of Appellant at 7. During oral argument, however, both parties argued the validity of the district court's elimination of the County's court-ordered release requirement, with the County urging the retention of a modified court-ordered release procedure. Specifically, we made the following inquiry to counsel for appellant:
 THE COURT: ... As to [paragraph] number one, do you have any objection to number one as it is in [the district court's] order? Do you now have any objection to number one as it is?
 MR. CARTON: I would not have an objection if there was a mechanism set up whereby [pregnant inmates seeking abortions] would be treated the same as other inmates seeking outside medical care.
 * * *
 THE COURT: You have no objection to a court-order process [that] can deal with the requests promptly?
 MR. CARTON: I don't think that's a problem.... Promptness is not a problem.
 Cassette Record of Oral Argument; accord infra note 12.
 In addition, during oral argument the County objected to the breadth of paragraph 4, arguing that it could be construed to impose on prison officials the obligation to arrange for the actual abortion procedure. The following revision, suggested by this Court and accepted by the County during oral argument, will, pursuant to our supervisory powers, 28 U.S.C. Sec. 2106 (1982), thus constitute the scope of the County's obligation under paragraph 4.
 
 
 [4]
 County defendants are not obligated to make arrangements for the abortion procedure, but they shall provide the necessary transportation to an appropriate medical facility for those inmates seeking an abortion, as soon as practicable following the inmate's decision to terminate the pregnancy
 The County does not contest the remaining paragraphs of the district court's order.
 
 
 [11]
 The County does not contend that a woman's constitutional right to choose an abortion does not survive in the prison context due to the very fact of incarceration. Indeed, such an argument would be difficult to reconcile with the current policy in the federal prisons of providing inmates with abortions upon request. See 28 C.F.R. Sec. 551.23(d) (1986). Moreover, the Supreme Court has held that significant rights of privacy survive in the prison context. See Turner, 107 S.Ct. 2254 (right to marry); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate). Any restriction or denial of a pregnant inmate's right to choose an abortion, therefore, must be justified by a legitimate penological objective
 
 
 [12]
 During oral argument, counsel for the County explained its policy as follows:
 MR. CARTON: ... In this case the County does not preclude abortion but only requires an order for release and does not oppose such an order.... The constitutional right to an abortion is irrelevant to the issue at hand; the County does not interfere with the exercise of that right.
 THE COURT: To sum up your position at this point, then, your only problem is that you believe that a woman who's confined and elects to have an abortion must get a court order?
 MR. CARTON: Well, to be released she must, I mean
 * * *
 THE COURT: Well, she can't have the abortion unless she's released, and therefore has to get the court order?
 MR. CARTON: That's correct.
 * * *
 THE COURT: Now, if you don't have a problem, concern with the safety of the ... inmate or the danger of escaping or violence, what is the purpose of the court-order? What ... purpose is served by the court-order from the County point of view?
 MR. CARTON: I don't think I understand your question.
 THE COURT: Well, why do you need a court order?
 * * *
 MR. CARTON: ... As a matter of course when anyone leaves the institution it's by writ or by some kind of order ... unless they go directly under the ... direction of the jail physician.
 Cassette Record of Oral Argument.
 
 
 [13]
 The concurrence overstates our reliance on this fact in sustaining the district court's preliminary injunction. See Concurring op. at 352. As we make clear, and as the concurrence recognizes, see id. at 353, notwithstanding the County's treatment of other forms of "purely elective" surgery, the challenged regulation fails to provide inmates with a meaningful opportunity to exercise their constitutionally protected right to choose to abort their pregnancies and thus contravenes the fourteenth amendment. See infra note 20
 
 
 [14]
 We undertake this task with the recognition that "not all distinction between abortion and other procedures is forbidden. The constitutionality of such distinction will depend upon its degree and the justification for it." Bellotti v. Baird, 428 U.S. 132, 149-50, 96 S.Ct. 2857, 2867, 49 L.Ed.2d 844 (1976) (citations omitted)
 
 
 [15]
 Contrary to Judge Mansmann's assertion, the County has never affirmatively maintained on this record "that security concerns underlie the challenged regulation." Concurring op. at 352. In a letter brief to the district court, the County maintained that "[it] cannot be burdened with purely elective medical procedures. The justifications for this policy are obvious.... Th[e court-ordered release] procedure insures that the County is not forced to pay for the elective procedure nor be burdened with the responsibility for arranging these procedures." Letter from Malcolm V. Carton, Esq. to The Hon. Harold A. Ackerman 2 (Apr. 25, 1986), reprinted in App. at A26-A27; accord supra note 12 (colloquy between Court and Mr. Carton)
 
 
 [16]
 We note also that, before the district court, the County advanced "the position that taxpayers dollars should not be used to fund abortions." Letter from Malcolm V. Carton, Esq. to The Hon. Harold A. Ackerman 2 (May 19, 1986), reprinted in App. at A29. Whatever the relevance of this position, it has no bearing on the County's duty to articulate a legitimate state interest in justification of its policy. In the course of discharging various penological responsibilities, whether or not they accommodate inmates' retained constitutional rights, prison officials will invariably expend state funds for purposes that are morally objectionable to some citizens. For instance, some citizens may consider morally offensive the expenditure of state funds to accommodate the religious practices of Jewish or Muslim inmates, to impose sentences of death or merely to provide three meals a day to convicted offenders. The moral objections of third party taxpayers, however, has never alone operated to relieve prison officials of affirmative obligations to prisoners in their custody where such obligations exist. To the extent that the County's position implies a legitimate state interest in accommodating the potential moral objections of taxpayers, it must be rejected
 
 
 [17]
 Indeed, were such an assertion to be accepted as a compelling state interest, most of the conditions challenged in MCCI Inmates I, 595 F.Supp. 1417, could be constitutionally justified merely due to lack of funds. Such a result impugns the sanctity of the Constitution and finds no support in the case law
 
 
 [18]
 Judge Mansmann's concurrence mischaracterizes MCCI inmates' fourteenth amendment claim as one concerned solely with compelling the County "to expend resources to provide inmates with assistance in exercising" their retained constitutional right to choose abortion. Concurring op. at 353. To the contrary, MCCI inmates independently challenge the very existence of the court-ordered release requirement. The additional economic factors raised by both the inmates and the County are more appropriately considered under the third element of the reasonableness standard articulated by the Supreme Court in Turner. See infra Part III. B. 3
 
 
 [19]
 The legitimate penological interests in the rehabilitation of the prisoner and the deterrence of crime are not implicated in this appeal
 
 
 [20]
 We note here that, in our view, the court-ordered release requirement may fairly be characterized as either a regulation that infringes on an inmate's right to choose freely to terminate her pregnancy or as an attempted accommodation of that right. Although the County contends that "[t]he fact that there exists a constitutional right to an elective, non-therap[e]utic abortion is irrelevant" to this appeal, Brief of Appellant at 14, the very fact that the County created the court-ordered release option solely to accommodate the requests of pregnant inmates seeking elective abortions is testimony to the County's recognition of the significance of those requests. At any rate, whether viewed as a regulation or an accommodation, the court-ordered release requirement does not satisfy the standards employed to determine either the reasonableness of a prison regulation or the adequacy of a required accommodation of prisoners' retained constitutional rights. See infra. We emphasize that, although we find relevant the fact that the court-ordered release requirement applies solely to inmates requesting elective abortions, the absence of a similar requirement for other forms of elective medical procedures is in no way central to our determination that the challenged policy impermissibly burdens the inmates' fundamental right to choose freely to terminate their pregnancies
 
 
 [21]
 The County vehemently maintained at oral argument that promptness was not a problem in the court-ordered release process. The district court, however, specifically rejected this contention, see MCCI Inmates II, 643 F.Supp. at 1223, 1228, and its finding is amply supported by the record
 The record reflects, for example, that Jane Doe, after being advised that to obtain an abortion she must secure court-ordered release, apparently contacted her attorney and sought to avail herself of the court order process. During a preliminary hearing on Doe's subsequent application for emergency relief, counsel for Monmouth County explained:
 MR. CARTON: ... There was an application made apparently several weeks ago ... [regarding] why she should be released on her own recognizance. That application was turned down because she had criminal charges in addition to the parole detainer. I've been advised that she's been released on her own recognizance on the criminal charges but not the parole detainer.
 THE COURT: She's being held as a parole violator?
 MR. CARTON: Right, only.
 THE COURT: So the reality is, she is still incarcerated, is that correct?
 MR. CARTON: Yes.
 SA at 28-29.
 Aside from the time necessarily consumed by Doe in contacting her lawyer and thereafter gaining access to the court, consideration of the merits of an inmate's application may itself, as in the case of Doe, require additional legal action before the inmate's release is secured. This is so without regard to whether the County opposes the initial application for court-ordered release. When "time is likely to be of essence in an abortion decision," H.L. v. Matheson, 450 U.S. at 412, 101 S.Ct. at 1172, and the only means available to effectuate that decision are laden with probable delays, such means are inadequate and essentially deprive a woman of the ability to exercise her constitutional right to choose to terminate her pregnancy.
 
 
 [22]
 MCCI inmates persuasively argue that "the presence of pregnant inmates in the prison population, with the concomitant need for accommodation of unique security, housing, dietary and clothing needs, as well as the need to arrange placement for the child once it is born, places a greater burden on jail resources and administrative concerns than would a woman who ends her pregnancy prior to full term." Brief of MCCI Inmates at 13 n. 9
 
 
 [23]
 We recognize that, ideally, under the court-ordered release requirement, prison officials need not expend any human or financial resources. We have held, however, that that requirement effectively denies to maximum security offenders the opportunity to exercise their choice to terminate their pregnancies and affirmatively interferes with the choice of low security risk offenders. Thus, the likely result of compelled full term pregnancies will require the identical expenditure of prison resources as would be necessary had the inmates initially elected childbirth
 
 
 [24]
 Similar economic arguments were made before the Supreme Court in Beal v. Doe, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). Specifically, respondents in Beal argued that, because "abortion is generally a less expensive medical procedure than childbirth" and "an early abortion poses less of a risk to the woman's health than childbirth[,] ... the economic and health considerations that ordinarily support the reasonableness of state limitations on financing of unnecessary medical services are not applicable to pregnancy." Id. at 445, 97 S.Ct. at 2371. The Court, accepting the economic assumptions as true, held that the state nonetheless retained a strong interest in promoting natural childbirth over abortion, which interest could be legitimately implemented through the allocation of public funds without violating Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396 et seq. (1970 ed. and Supp. V). 432 U.S. at 445, 97 S.Ct. at 2371. In Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), decided the same day as Beal, the Court further explained that the state's decision to implement its value judgment through the allocation of public funds does not contravene the Equal Protection Clause of the fourteenth amendment where the unequal subsidization of childbirth and abortion "places no obstacles--absolute or otherwise--in the pregnant woman's path to an abortion." Id. at 474, 97 S.Ct. at 2382. Finally, in Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), and in Williams v. Zbaraz, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980), the Court again affirmed the legitimacy of the state's interest in promoting childbirth over abortion through the allocation of public funds even where the desired abortion was "medically necessary." Quoting Maher, the McRae Court noted that " '[t]he State may have made childbirth a more attractive alternative, thereby influencing the [indigent] woman's decision, but it has imposed no restriction on access to abortions that was not already there.' " 448 U.S. at 314, 100 S.Ct. at 2687
 In each of these decisions, the reasonableness of the state regulation was not assessed in terms of the relative costs of funding each procedure. Rather, because the state was entitled "to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds," Maher, 432 U.S. at 474, 97 S.Ct. at 2382, the constitutionality of the regulation turned upon whether "the State attempt[ed] to impose its will by force of law ... [or merely] to encourage actions deemed to be in the public interest." Id. at 476, 97 S.Ct. at 2383. As indicated at various points in this opinion, we find no logical connection between a policy promoting childbirth over abortion in the prison context and legitimate penological objectives. See infra note 26. Consequently, we think the relative cost of childbirth and abortion is a relevant factor in determining the reasonableness of the challenged regulation. Cf. Turner, 107 S.Ct. at 2262. Moreover, as also indicated throughout this opinion, the County's policy of requiring court-ordered release to obtain an elective, nontherapeutic abortion affirmatively imposes an obstacle in the pregnant inmate's path to an abortion. This obstacle exists notwithstanding the inmate's particular economic status. Thus, even when viewed under the Supreme Court's Medicaid funding decisions, the County's policy unreasonably favors a more costly procedure without legitimate penological justification and directly infringes on the pregnant inmate's exercise of her otherwise retained right to choose to terminate her pregnancy.
 
 
 [25]
 Conversely, amici The American Civil Liberties Union ("ACLU") and The American Public Health Association ("APHA") argue that accommodation of an inmate's right to choose abortion "is consistent with the government's interest in inmate rehabilitation." Brief of Amici Curiae The American Civil Liberties Union and The American Public Health Association at 11 ("ACLU/APHA Brief"). Amicus New Jersey Association on Correction further suggests that the increased anxiety imposed by an unwanted pregnancy on a female offender will gravely affect the woman's reintegration into society. Brief of Amicus Curiae New Jersey Association on Correction at 1-3 ("N.J.A.C. Brief"). The Association on Correction implicitly contends that the goal of prisoner rehabilitation is undermined by the County's policy and that that policy may indeed foster recidivism where an inmate, upon release, is faced with the added burden of caring for a new child. See also Brief for Monmouth County Correctional Institution Inmates at 13 ("there are no conceivable penological purposes ... relevant to the restriction of a woman's ability to terminate pregnancy")
 
 
 [26]
 Amici ACLU and APHA argue that the County's policy, rather than rehabilitating, "compels women inmates to continue their pregnancies to term and imposes upon them the unwanted birth of a child ... [in] violat[ion of] the Eighth Amendment's prohibition against cruel and unusual punishment." ACLU/APHA Brief at 35 n. 19. In this regard, ACLU and APHA maintain that "enforced childbearing is never constitutionally appropriate punishment for criminal wrongdoing." Id. Assuming arguendo that enforced childbearing is an appropriate punishment in certain circumstances, however, ACLU and APHA contend that, as to pretrial detainees, the County's policy unconstitutionally imposes "punishment" upon those who have not been convicted of any crime, and that, with respect to sentenced inmates, the policy indiscriminately compels pregnancy on inmates regardless of the offense committed and thus "bears no relationship to the crime" as required by the eighth amendment. Id. at 36 n. 19
 
 
 [27]
 During oral argument, the availability of funding through Planned Parenthood was suggested as an option for indigent inmates desiring elective, nontherapeutic abortions. Following argument, we were advised by letter from counsel for MCCI inmates that Planned Parenthood of Monmouth County "has neither private nor public funds available to subsidize abortion services, and is equipped to provide abortions only through the twelfth (12th) week of pregnancy." Letter from Catherine A. Hanssens, Esq. (Mar. 23, 1987). The letter further stated "that abortions at the Planned Parenthood clinic are financed entirely through patient fees and Medicaid Funds (for which prisoners are ineligible)." Id
 Whatever the actual funding and medical service possibilities available through Planned Parenthood, our decision today does not foreclose the possibility of such arrangements with philanthropic organizations as might adequately accommodate an inmate's right to choose abortion. Cf. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 245, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (governmental entity responsible for ensuring that needed medical care is provided to injured, unconvicted detainees may meet its obligation by means other than directly paying for the medical care). We emphasize here, however, that, unlike the situation in Maher, where "the impact of the [challenged] regulation f[ell] upon those who c[ould] not pay," 432 U.S. at 471, 97 S.Ct. at 2381, the unconstitutionality of the County's policy arises from the unjustified restriction on the rights of all inmates--regardless of their security classification and regardless of their economic status--who desire to obtain elective, nontherapeutic abortions.
 
 
 [28]
 Because a pregnant inmate has the fundamental right to choose abortion and a need for medical services, both the fourteenth and eighth amendments are implicated in our process of determining the parameters of the County's obligation with respect to inmate-requested abortions. Under fundamental rights analysis, the central inquiry is whether a prison regulation--here, the court-ordered release requirement--unreasonably burdens the exercise of the asserted right. In determining the reasonableness of the regulation, Turner instructs that the costs of accommodation is a relevant factor. See 107 S.Ct. at 2262. Under eighth amendment analysis, a prison's financial obligation with respect to the medical needs of its inmates is paramount. Accordingly, we consider separately MCCI inmates' claim that, notwithstanding procedural barriers to their right to choose freely to terminate their pregnancies, the County is financially obligated to provide services related to the serious medical needs of its inmates, which include elective abortions
 
 
 [29]
 We note again, however, that the County has not deemed requests for other elective medical procedures to be significant enough to warrant a court-ordered release requirement or any other procedure for release. See supra note 20
 
 
 [30]
 The likelihood that these maximum security offenders will be totally deprived of the opportunity to have a safe abortion, irrespective of their terms of incarceration, is enhanced by the failure of the County to consider anywhere in its policy towards inmate-requests for elective, nontherapeutic abortions the gestation period at the time of the initial request
 
 
 [31]
 The population at MCCI consists of both pretrial detainees and convicted and sentenced inmates. The constitutional standard governing conditions of confinement for detainees is whether the conditions amount to "punishment" without due process of the law, in violation of the fourteenth amendment. See Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). For sentenced inmates, the eighth amendment's proscription against cruel and unusual punishment requires that conditions of confinement not subject prisoners to unnecessary and wanton infliction of pain. See Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). While the constitutional standards governing the general conditions of confinement for pretrial detainees and sentenced inmates therefore differ, the standards governing the provision of medical care to each of these inmate classes are similar. See Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979). Under the eighth amendment, prison officials are proscribed from exhibiting "deliberate indifference to the serious medical needs of prisoners." Estelle, 429 U.S. at 104, 97 S.Ct. at 291. This proscription defines the government's responsibility towards convicted prisoners. Where no formal adjudication of guilt has been rendered, the Due Process Clause of the fourteenth amendment requires the government to provide medical care to unconvicted persons in its custody. See City of Revere v. Massachusetts, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). "[T]he due process rights of [a detainee] ... are[, therefore,] at least as great as the Eighth Amendment protections available to a convicted prisoner." Id. Accordingly, "at a minimum the 'deliberate indifference' standard of Estelle v. Gamble, must be met," Pierce, 612 F.2d at 762, for each group of inmates incarcerated at MCCI
 
 
 [32]
 We recognize that the preliminary determination by the jail physician whether an inmate-requested abortion is medically necessary or "purely elective" presumably affords a pregnant inmate with individualized care. We further recognize that categorization of a prison's medical obligations alone may be insufficient to establish the deliberate indifference contemplated by Estelle. On the facts presented to this Court, however, we think it clear that, by virtue of its categorization of elective abortions as beyond its duty to provide, the County has exhibited deliberate indifference to the medical needs of inmates electing abortion. Specifically, pursuant to its self-defined obligation, the County has adopted a policy that fails to consider for individual inmates (1) the gestation period at the time the request for an abortion is made, (2) the likely duration of incarceration and (3) the likelihood of release under the uncontested court-ordered release procedure. Failure even to consider such factors, each of which is relevant to the safe termination of an inmate's pregnancy, evinces a deliberate indifference to the medical needs of inmates desiring abortions
 
 
 [33]
 Decisions holding that mere disagreement as to type and quality of treatment does not state a claim of constitutional deprivation, see, e.g., Bowring v. Godwin, 551 F.2d 44 (4th Cir.1977); Limbert v. Umar, 585 F.Supp. 1413 (E.D.Pa.1984), do not affect an eighth amendment claim based upon the denial of abortion services necessary to implement the woman's choice to terminate her pregnancy. That choice is constitutionally guaranteed and functionally independent of disagreements over diagnostic treatment. Once the choice is made, however, and not before, the inmate may be required to defer to the medical judgment of the attending physician as to how the pregnancy is to be terminated
 
 
 [34]
 Under the County's view, medical care associated with full term pregnancy would not constitute a "serious medical need" under Estelle, "pregnancy, in and of itself, not being an 'abnormal medical condition.' " Brief of Appellants at 14
 
 
 [35]
 As one author has noted,
 the inmate's employment opportunities are controlled by the state. If she is permitted to work at all, she works within the prison, for limited time periods, and at minimal prison wages. Thus, her ability to earn enough money to pay for an abortion is virtually nonexistent while she is incarcerated. Furthermore, outside sources of income most notably welfare payments and Medicaid services, are not available to the inmate. [See 42 U.S.C. Sec. 1396d(a)(18)(A) (1982) (inmates of public institutions ineligible to receive Medicaid and welfare funds).]
 Vitale, Inmate Abortions--The Right to Government Funding Behind Prison Gates, 48 Fordham L.Rev. 550, 558 (1980).
 
 
 [36]
 Although we recognize that the due process rights of detainees are at least as great as the eighth amendment rights of convicted inmates, City of Revere, 463 U.S. at 244, 103 S.Ct. at 2983, we do not believe it follows automatically that the government's financial obligation, if any, to secure these rights of detainees is also identical. Cf. Norris v. Frame, 585 F.2d 1183, 1187 (3d Cir.1978) ("The protection afforded convicted felons under the eighth amendment is often useful 'by analogy' in determining the protection to be afforded detainees under the fourteenth amendment[; however, t]he two levels of protection ... should not be thought of as co-extensive.")