**Jamie Christina REILLY, Plaintiff,**

v.

**Henry GRAYSON, Chris Daniels, Joseph Cross, Mark Kallus, Craig Hutchinson, Defendants.**

**No. 95–76362.**

United States District Court,
E.D. Michigan,
Southern Division.

June 22, 2001.

Daniel E. Manville, Ferndale, MI, for Plaintiff.

Jonathan C. Pierce, Michigan Dept. of Atty. General Labor Div., Kansing, MI,. Landis Y. Lain, Office of the Atty. General Corrections Div., Lansing, MI, Lamont M. Walton, Mich. Dept. of Atty. General Tort Defense Div., Lansing, MI, Deborah R. GArcia-Luna, Kevin R. Himebaugh, Mich. Dept. of Atty. General Corrections Div., Lansing, MI, Daniel E. Manville, Ferndale, MI, for Defendants.

## OPINION

COHN, District Judge.

### I.   Introduction

This is a prisoner civil rights case, 42 U.S.C. § 1983.  Plaintiff Jamie Christina Reilly (Reilly) is in the custody of the Michigan Department of Corrections (DOC).  Reilly is suing defendants Henry Grayson (Grayson), warden of the Trustee Division of the State Prison of Southern Michigan, sometimes called the Parnell Correctional Facility (Parnell);  Chris Daniels (Daniels), a deputy warden at Parnell;  Joseph Cross (Cross), a deputy warden at Parnell;  and Mark Kallus (Kallus) and Craig Hutchinson (Hutchinson), medical doctors in the employ of DOC.  Reilly claims that his asthma required that he be placed in a housing unit free of environmental tobacco smoke (ETS), a requirement known to defendants, and that their failure to do so violated his Eighth Amendment right to be free from cruel and unusual punishment in the form of exposing him unreasonable risk of serious damage to his health.  As a consequence of defendants' deliberate indifference to the smoke-free housing requirement, Reilly claims damages and injunctive relief.  Put another way, Reilly claims that defendants were deliberately indifferent to his serious

medical needs and exposed him to an unreasonable risk of serious damage to his health.

For the reasons that follow, which constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52, the Court finds Grayson, Daniels, and Cross liable to Reilly for non-economic damages in the amount of $36,500 and punitive damages in the amount of $18,250. Since Reilly is now assigned to a smoke-free facility his claim for injunctive relief is moot.[1]

## II. Background

The complaint was filed October 30, 1995. On May 29, 1996, the Court denied defendants' motion for dismissal and/or summary judgment following a magistrate judge's Report And Recommendation to that effect. *See* Report And Recommendation filed April 17, 1995. On August 8, 1998, the Court denied defendants' renewed motion for summary judgment following a magistrate judge's Report And Recommendation to that effect. *See* Report And Recommendation filed July 13, 1998.

An Amended Final Joint Pretrial Order was filed December 18, 2000. The case was tried to the bench over 4 days: January 8 and January 9, 2001, February 20, 2001, and March 16, 2001.

## III. The Trial

The evidence at trial was generally as follows.

### A. Plaintiff's Witnesses

Reilly described the variations in his custody conditions since he entered prison in 1989, as well as:

- his medical condition, including his asthma and the adverse effect of the ETS to which he was exposed at Parnell on his health;
- his receipt of an Individual Management Plan (IMP) in 1994, and again in 1996, which required that he be placed in a smoke-free environment; (Px 12 and Px 24)
- the failure to place him in a smoke-free environment notwithstanding his repeated requests to do so;
- the medical treatment he received for his asthma;
- his repeated contacts with Grayson, Daniels, and Cross, his requests to each of them to do something about his exposure to ETS, and his placement contrary to the IMPs.

Reilly's fellow prisoners, James C. Cannon, Wellington Drake, Joseph Lentini, and Rich VanLandegent, each described their confinement in the same housing units as Reilly at Parnell and the smoke-filled condition of each of such units. They each testified that even though smoking was forbidden in these units, residents generally did so.

James B. Chamberlain, a licensed practical nurse and Donald Wagner, a certified physicians assistant, each described the medical treatment received by Reilly for his asthma and the prescription drugs he received.

Dan L. Bolden (Bolden), Deputy Director of the DOC for Housing, described the resident placement policy of the DOC, Reilly's placement from time-to-time, the problems encountered as a consequence of prisoners smoking contrary to rules, his approval of the two IMPs for Reilly (each of which called for placement in a single occupancy cell in a smoke-free housing unit), and his lack of personal knowledge

---

1. The transfer came shortly after the testimony of a senior official of the DOC. *See* p. 4, *infra.*

of Reilly's effort to obtain compliance with the IMPs.

Travis Jones, a deputy warden at Parnell, described the significance of an IMP and the lack of a smoke-free housing unit at Parnell during his tenure.

Nancy Haley (Haley), a chemist, described the presence of continine in Reilly's urine which established his ingestion of tobacco smoke (Px 62). The urine sample was supplied in mid-January of this year.

Jamie L. Repace (Repace), an expert on the effects of ETS, described its presence in the environment, particularly in a prison setting, and its injurious affect on a person suffering from asthma, including the increased risk of lung cancer and heart disease.

### B. Defendants' Witnesses

Grayson, Cross, and Daniels each described their responsibilities for the assignment of residents at Parnell, their familiarity with Reilly, their knowledge of the IMPs, the presence of ETS in Reilly's housing units and admitted that, while they had the authority to do so, they did not transfer Reilly from Parnell to a DOC facility which was free of ETS. Each denied that he was deliberately indifferent to Reilly's medical needs.

### C. Medical Testimony

Hutchinson and Kallus were the only two medical doctors with direct knowledge of Reilly's medical condition. They differed in their assessment of Reilly's medical condition and particularly, the extent of his asthma and the effect of Reilly's exposure to ETS on his medical condition.

#### 1. Kallus

Kallus, who intermittently observed and sometimes treated Reilly, beginning in 1994, acknowledged that Reilly's medical records reflected a diagnosis of asthma and that he exhibited shortness of breath—a symptom of asthma. Kallus, however, was reluctant to make a diagnosis of asthma because of an absence of physical findings. Kallus acknowledged that Reilly's medications included anti-inflammatory drugs typically prescribed for asthmatics. Kallus did not find Reilly's exposure to ETS as putting him at a serious risk of medical danger. Kallus said he brought to Cross's attention the IMPs, the fact that Reilly's housing exposed him to ETS, and indicated that Reilly complained to him about being exposed to ETS. Kallus simply accepted Cross's statement that the requirements of the IMP were being met. Thus, although Kallus knew that Reilly's placement exposed him to ETS contrary to the requirements of the IMP, he did nothing about it.

Kallus was not a credible witness. Kallus's answers were sometimes vague and evasive. Many times, Kallus could not recall past events. At best, Kallus's opinion that Reilly was not exposed to an unreasonable risk of serious damage to his health was based on the absence of a clinical finding of asthma in Reilly's medical records. Kallus, however, knew of the filing of the complaint and that for more than five years, he was a defendant in a lawsuit claiming he was liable to Reilly for being deliberately indifferent to his medical needs and that he had put Reilly to an unreasonable risk of serious medical damage to his health. Nonetheless, Kallus made no effort to have the IMP modified or requested that Reilly go through testing that might clinically diagnose the extent of his asthma, if any.

#### 2. Hutchinson

Hutchinson did not directly treat Reilly. Hutchinson wrote the initial IMP and, on occasion, wrote orders for Reilly's medical condition. The diagnosis of asthma, Hutchinson said, came from a doctor at the

medical center (Px 11.) Hutchinson, however, did order a pulmonary function test to "try and help more firmly establish the diagnosis of asthma." (Tr. 1/9/01, p. 89). The result of the test supported a diagnosis of asthma.

Hutchinson was of the opinion Reilly had asthma and that asthmatics are sensitive to ETS. Hutchinson described the medications that Reilly was receiving and confirmed that they were for treatment of asthma; he also acknowledged that over the years, the medications were stepped up. The medications ranged from Albuterol, a drug for mild episodic asthma, to Azmacort, an inhaled steroid medication given to people who have continued displays of asthma symptoms, which suggests a more severe case of asthma. Hutchinson stated that moderate asthma is considered a serious medical condition. (Tr. 1/9/01, p. 97). The requirement of the IMPs, Hutchinson said, called for "a non-smoking housing unit, placed where people don't smoke inside the building." (Tr. 1/9/01, p. 101).

Finally, on cross-examination Hutchinson said:

Q. ... Is there a medical need in your opinion at this time for a transfer to a differently facility for [plaintiff]?

A. If it is true that the nonsmoking policy where he is housed is not enforced, then I think he should be transferred to a place where it is if there is such a place. It is possible that [plaintiff] could be made more comfortable in the current location with some additional measures, possibly the aerosol machine, but ideally there should be a movement to a place, if there is such a place in the department, where smoking is not permitted and that rule is enforced consistently.

Q. ... Where he is right now is he at a serious risk of real bad health concerns?

A. Not in the immediate future, no. Over years and years and years if there is truly environmental tobacco smoke, yes.

(Tr. 1/9/01, p. 126.)

### D. Exhibits

The exhibits introduced at trial included:

● DOC records relating to Reilly;

● Reilly's medical records;

● Documentation of Reilly's various housing placements;

● Reilly's letters to prison officials;

● Intra-prison memoranda, prison regulations and policy directives;

● Various articles on asthma and the effect of ETS;

● Haley's report on the presence of continine in Reilly's urine;

● Numerous articles identified by Repace describing the effects of ETS on asthmatics; (Px 49, Px 50–53)

● A report by Repace (Px 61); and

● Reilly's Security Classification Screening–Review (Px 63), which reflected his transfer of plaintiff to a smoke-free environment on January 24, 2001, approved by Bolden following his testimony.

### IV. Findings of Fact

After consideration of the testimony and exhibits, drawing such inferences as appropriate, weighing the evidence and assessing the credibility of witnesses, the Court finds as follows:

1. Reilly was committed to the custody of the DOC in August 1989.

2. In September 1989, Reilly was transferred to the Cotton Correctional Facility (Cotton).

3. In March 1993, Reilly was transferred to the Egeler Correctional Facility.

4. The transfer order (Px 46) called for Reilly to be placed in a non-smoking unit.

5. Placement in a non-smoking unit requires the facility to be tobacco free or placement in a single enclosed room with a separate ventilation unit.

6. Such facilities and such rooms are available in various DOC facilities.

7. In June 1993, Reilly was transferred back to Cotton.

8. In September 1994, Reilly was transferred to Parnell because it has a lower security classification than Cotton.

9. Reilly's placement in a housing unit was subject to an IMP dated January 3, 1994 (Px 12).

10. The 1994 IMP called for Reilly's placement in a single occupancy cell in a smoke-free housing unit. The IMP stated as follows:

Mr. Reilly should be provided with a single occupancy cell in a smoke-free housing unit. This is appropriate in light of his gender identity disorder as well as due to his asthma and his reported cigarette smoke sensitivity.

11. While a single occupancy cell was called for, in part, because of plaintiff's Gender Identity Disorder, there is no evidence of record which suggests Reilly's Gender Identity Disorder was the sole reason for the IMP.

12. The 1994 IMP was approved by DOC's Chief Medical Officer and Bolden.

13. At Parnell, Reilly was initially placed on the ground floor level in Block 10 which, at the time, was designated a non-smoking block.

14. Despite the designation as non-smoking, inmates still smoked.

15. The cells in Block 10 have open bars in front and back, and face an open bay.

16. On September 27, 1994, Reilly filed a detailed grievance regarding his placement in Block 10 and his exposure to ETS (Px 19).

17. In December 1994, Block 10 reverted to a smoking block.

18. Thereafter, Reilly filed an number of grievances describing his asthmatic condition, his exposure to ETS, and its adverse affect on his health.

19. In September 1996, Reilly was placed on the ground floor level in Block 16, a non-smoking block.

20. The cells in Block 16 have open bars in front and face an open bay.

21. Contrary to the regulations, residents of Block 16 regularly smoked.

22. Notwithstanding its designation as a non-smoking block, residents of Block 16 were regularly exposed to ETS.

23. A second IMP was issued for Reilly on December 9, 1996 (Px 24), which again called for Reilly's placement in a single occupancy cell in a smoke-free housing unit.

24. The second IMP was approved by Hutchinson, as DOC's Acting Chief Medical Officer and Bolden.

25. On June 18, 1997, a directive was issued prohibiting smoking in the resident units. (Px 40)

26. Tobacco, however, was not deemed contraband since smoking was permitted outside.

27. Smoking inside housing units was a persistent problem in DOC facilities; rules against smoking were more honored in the break than the observance.

28. Reilly's medical records, diagnostic treatment, and drugs regularly prescribed for him, including Proventil, Serevent and Flovent, establish that Reilly suffered from asthma.

29. Exposure to ETS exacerbates the symptoms of asthma such as shortness of breath and difficulty in breathing.

30. Shortness of breath and difficulty in breathing represents a risk of serious damage to health, especially since the symptoms increase in severity over time, particularly when exposed to ETS.

31. The exposure of ETS by an asthmatic also increases the risk of cardiovascular disease, cancer, and respiratory disease.

32. As early as 1994, Reilly requested a transfer to Cotton; Reilly continued to request such a transfer.

33. The filing of suit in 1995 and the orders denying motions to dismiss which effectively affirmed the magistrate judge's two Reports And Recommendations that Reilly's claim to be placed in an environment free of ETS required resolution by trial, alerted Grayson, Daniels, and Cross to the Inappropriateness of Reilly's continued placement at Parnell. For example,

   a. In the complaint filed October 30, 1995, Reilly prayed for (1) damages and (2) placement in a smoke-free environment.

   b. The magistrate judge's Report And Recommendation dated April 27, 1996 stated in part:

   Given the state of the law as indicated by the decisions of the Sixth Circuit and the Supreme Court, reasonable officials should know that the actions plaintiff complains of were not lawful.

   c. Reilly was deposed on October 9, 1996 and testified in detail about his asthmatic condition, the smoke-free housing requirement of the IMPs, the ETS environment of his housing unit, and the exacerbation of his medical condition by ETS.

   d. The magistrate judge's Report And Recommendation dated July 13, 1998 stated in part

   plaintiff has presented evidence of his serious medical need to be placed in a non-smoking unit.

   .     .     .     .     .

   Plaintiff has presented evidence that defendants knew of his medical need but failed to accommodate it, and that such inaction could establish defendants' deliberate indifference.

35. Grayson, Daniels, and Cross each had direct responsibility for Reilly's placement.

36. Grayson's responsibility extended from October 1994 to the date of Reilly's transfer to Cotton this year.

37. Cross's responsibility extended from February 1995 to April 1996.

38. Daniels's responsibility extended from October 1994 to the date Reilly was transferred to Cotton this year, except for the period when Cross was responsible.

39. Grayson, Daniels, and Cross were each aware of the IMPs.

40. Grayson, Daniels, and Cross each had an obligation to follow the requirements of the IMPs and assure that Reilly was placed in a smoke-free housing unit even if a transfer out of Parnell was necessary.

41. There was a DOC system-wide problem of enforcement of the rules against smoking, of which Grayson, Daniels, and Cross had knowledge.

42. ETS was present throughout every housing unit at Parnell (with the exception of Block C) notwithstanding DOC regulations to the contrary and Grayson, Daniels, and Cross knew this.

43. Because Reilly was ineligible for placement in Block C because it had no single cells, compliance with the IMPs required that Reilly be transferred out of Parnell.

44. Healthcare professionals in DOC constantly urged more aggressive action and were constantly rebuffed; as Hutchinson testified, "it was a seesaw battle." (Tr. 01/09/01 at p. 110.)

45. Grayson, Daniels, and Cross's testimony, in which each said he had no particular recollection of Reilly's file and had only a vague recollection of Reilly's efforts to obtain transfer to a smoke-free environment, was not credible.

46. Grayson, Daniels, and Cross, individually and collectively, took no action to assure that Reilly was placed in a housing unit free of ETS.

47. Grayson, Daniels, and Cross's failure to act was not by accident, inadvertence or neglect; the failure to act by Grayson, Daniels, and Cross was deliberate.

48. Reilly was exposed to an unreasonable risk of serious damage to his health by reason of the inaction of Grayson, Daniels, and Cross.

49. Kallus and Hutchinson were not responsible for the housing placement of Reilly.

50. Bolden, who had the final authority for Reilly's assignment and placement, first became aware of Reilly's efforts to obtain placement in a housing unit free of ETS the day before he testified. (Tr. 1/9/01, p. 33.)

51. Had Bolden been told of the magistrate judge's Report And Recommendation of April 1996 (17 pages) or the magistrate judge's Report And Recommendation of July 1998(20 pages), Reilly's request for placement free of ETS could have been easily accomplished-Cotton was such a facility. (Tr. 1/9/01—p.33.)

## V.   Applicable Law

### A.   Cruel and Unusual Punishment

#### 1.

■ The case law establishes beyond any doubt that, in particular circumstances, a prison inmate's Eighth Amendment right to be free from cruel and unusual punishment is violated because of his/her placement in a smoke-filled environment. What the prisoner must establish is a serious medical need (objective component) and deliberate indifference to that need (subjective component) by the accused prison officials. *Hunt v. Reynolds*, 974 F.2d 734 (6th Cir.1992). The Supreme Court has stated there is a violation of the Eighth Amendment in these

---

circumstances in *Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

■■■ These requirements were reiterated in *Jacobs v. Young,* 134 F.3d 371 (6th Cir.1997) (unpublished table opinion); 1997 WL 809925, where the Court of Appeals for the Sixth Circuit stated:

> An Eighth Amendment claim must contain both an objective and a subjective component. *Hunt v. Reynolds,* 974 F.2d 734, 735 (6th Cir.1992). Subjectively, a plaintiff must prove that defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prison official may be held liable under the Eighth Amendment only if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). With respect to the objective component, a plaintiff must establish that he has a serious medical need for a smoke-free environment, *see Hunt,* 974 F.2d at 735–36, or that, regardless of health, the level of ETS in the prison creates an unreasonable risk of serious damage to his future health. *See Helling v. McKinney,* 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).·

> .     .     .     .     .

> Jacobs therefore has presented evidence that defendants were aware that he faced the risk of harm by being housed with smokers, yet defendants disregarded that risk. Defendants cannot rely on the fact that the prison physician merely recommended rather than mandated that Jacobs be housed with a non-smoker to show that their failure to move Jacobs was reasonable; defendants have failed to show that they

took reasonable measures to abate the risk of harm to Jacobs.

*Jacobs* at \*2–3.

The most recent discussion of Eighth Amendment implications of exposure to ETS by a prison inmate is found in *McIntyre v. Robinson,* 126 F.Supp.2d 394 (D.Md.2000). There, the district court said:

> ... whereas a generalized risk of future harm may reasonably and perhaps only be addressed by implementation of an anti-smoking policy, existing serious medical needs are susceptible to and may reasonably require more specific action. By way of illustration, a prison official presented with a doctor's note indisputably diagnosing an inmate with a heart condition and recommending that he be provided with a nonsmoking cellmate could not reasonably ignore the recommendation in reliance on an anti-smoking policy. On the other hand, the same official presented with evidence that ETS exposure can cause future health problems might quite possibly be able to rely on little else. By the same token, whereas a reasonable person might not know that he has created an unconstitutional risk to inmates' future health once a nonsmoking policy has been put in place, that same person might just as reasonably be expected to know that his disregard of the existing serious medical needs of a given inmate was unconstitutional.

126 F.Supp.2d at 402.

### B.   Serious Medical Need

■■■ As to what constitutes a serious medical need, the Court of Appeals for the Third Circuit in *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326 (3rd Cir.1987), explained as follows:

A medical need is "serious," in satisfaction of the second prong of the *Estelle* test, if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment. For instance, *Estelle* makes clear that if "unnecessary and wanton infliction of pain" results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment.

834 F.2d at 347 (internal citations omitted).

## VI. The Decision

Stripped to their essence, the questions here are:

A. Did plaintiff have a serious medical need to be placed in a smoke-free environment?

B. Were defendants deliberately indifferent to that need?

Taking these two questions in reverse order, the answers follow.

### A.

■ That Grayson, Daniels, and Cross were deliberately indifferent to plaintiff's need to be placed in a smoke-free environment is clear. The test is not, as was put in cross-examination to Hutchinson, whether there is a "serious risk of real bad health," but rather, whether there is a serious risk of damage to health. The IMPs required Reilly's placement in a smoke-free environment. Grayson, Daniels, and Cross each knew of the IMPs and had the obligation to follow their requirements. The IMPs expressly called for a "single occupancy cell in a smoke free housing unit." There was no such cell

available in Parnell for Reilly. Grayson, Daniels, and Cross each knew this. Inmates in each of the blocks in Parnell were exposed to ETS (with the exception of Block C, for which Reilly was ineligible). The non-smoking regulations were consistently violated. Grayson, Daniels, and Cross each knew this.

Additionally, with the filing of this case on October 30, 1995, Grayson, Daniels, and Cross were each alerted to the fact that the IMPs were not being followed and that plaintiff alleged that each of them was deliberately indifferent to his serious medical needs. Twice during the course of this case to trial Grayson, Daniels, and Cross endeavored to obtain dismissal and twice they were rebuffed. Each was told that plaintiff had made out a case for trial on his claim of deliberate indifference to his serious medical needs. Yet, even with all of this in front of them, Grayson, Daniels, and Cross did absolutely nothing; they did not question Kallus or Hutchinson. Grayson, Daniels, and Cross are not low-level employees of DOC, but rather are directly responsible for the proper operation of Parnell, which includes the proper placement of its inmates.

### B.

■ Reilly's serious medical need to be placed in a smoke-free environment was also proven by a preponderance of the evidence. The IMPs required such placement. Reilly was asthmatic. The symptoms of asthma are exacerbated by ETS. As stated in *Monmouth County*, "a medical need is 'serious,' . . . if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.' The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treat-

ment." 834 F.2d at 347 (quoting *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

Hutchinson diagnosed Reilly as an asthmatic. The drugs prescribed for him, in accelerating intensity, were for treatment of his asthma. The symptoms he exhibited established his need for treatment. Beyond the drugs, what Reilly required, as established by the record, was to be free of ETS. That Reilly was not in a smoke-free environment endangered his health.

### C.

■ Finally, just as in *Jacobs,*
Defendants cannot rely on the fact that the prison physician merely recommended rather than mandated that [Reilly] be housed [in a non-smoking cell] to show that their failure to move [him] was reasonable; defendants have failed to show that they took reasonable measure to abate the risk of harm to [Reilly].

*Jacobs, supra* at *3.

### VII. Damages

### A. Compensatory

■ As the Court told the jury in *Owens v. Straub*, Civil No. 98–CV–72458 (June, 2001), its most recent expositions of damages in a prisoner civil rights case:

In considering the issue of Plaintiff's damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full, just and reasonable compensation for all of the Plaintiff's damages, no more and no less. Compensatory damages are not allowed as a punishment and must not be imposed or increased to penalize the Defendants.

Also, compensatory damages must not be based on speculation or guesswork

because it is only actual damages. In this respect it is not value you are trying to determine, but an amount that will fairly compensate Plaintiff for those claims of damage. There is no exact standard to be applied; any such award should be fair and just in the light of the evidence.

Here, Reilly was denied a smoke-free cell for approximately five years, or 1,825 days, by the Inactions of Grayson, Daniels, and Cross. Compensation for Reilly's pain and suffering as well as mental anguish for all of these days at the rate of approximately $20 a day is fair and just. Reilly is therefore entitled to compensatory damages of $36,500.

### B. Punitive

■ Again, as the court told the jury in *Owens:*

If you find for Plaintiff, and if you award compensatory damages, you may, but are not required to, award punitive damages. The purposes of punitive damages are to punish a defendant and to deter a defendant and others from committing similar acts in the future.

Plaintiff has the burden of proving that punitive damages should be awarded, and the amount, by a preponderance of the evidence. You may award punitive damages only if you find that Defendant's conduct was malicious, or in reckless disregard of Plaintiff's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injury another. Conduct is in reckless disregard of Plaintiff's rights, if under the circumstances, it reflects complete indifference to the safety and rights of others.

If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to

fulfill their purposes but should not reflect bias, prejudice, or sympathy toward any party. In considering punitive damages, you may consider the degree of reprehensibility of the Defendant's conduct and the relationship of any award of punitive damages to any actual harm inflicted on the plaintiff.

Here, Grayson, Daniels, and Cross were clearly reckless in their disregard of Reilly's rights, particularly in light of the notice they had with the filing of the complaint and the two Reports And Recommendations by the magistrate judge. Grayson, Daniels, and Cross each clearly ignored his supervisory obligations and, as a consequence, should suffer the opprobrium of punitive damages, not so much to deter each of them in the future, but to deter other officials in like positions of ignoring their responsibility.

Punitive damages in the amount of $ 18,250 is a fair and just award.

### C. Apportionment

Grayson, Daniels, and Cross are not equally culpable. While Grayson had responsibility for the full 5 years involved, Daniels and Cross had responsibility only for portions of the period. However, the Court will enter a joint and several judgment. If Grayson, Daniels, and Cross are unable to informally apportion the judgment among themselves, the Court will do so upon application.

### VII. Conclusion

#### A.

In a bench trial, the Court is the surrogate of a jury. Had a jury been impaneled to hear this case and charged as is stated in the Eleventh Circuit Pattern Jury Instructions, Civil 2.3.2, Civil Rights, *42 U.S.C. § 1983 Claims Eighth Amendment Claims Convicted Prisoner Alleging Deliberate Indifference To Serious Medical Need* (a copy of which is attached), based on the evidence and arguments of record, it more likely than not would have found for Reilly and awarded him compensatory and punitive damages in the aggregate of $ 54,750.

This was a case that did not have to be. The record in this case covers more than five years of activity, from filing to decision after trial, reflected in approximately 119 docket entries. Two Reports and Recommendations were issued by a magistrate Judge, each attesting to the seriousness of the allegations of the complaint. The record also shows at least five different lawyers representing defendants over the five years.

Early on in the case, had Grayson, Daniels, or Cross, or better yet, one of their lawyers, taken a moment to reflect on what was going on, and simply taken steps to transfer Reilly out of Parnell (or at least given him the clear opportunity to reject a transfer), the result likely would have been much different. Instead, Grayson, Daniels, and Cross, or perhaps their lawyers, were determined to mount a Stalingrad-like defense, ignoring the allegation of the complaint, as well as the view of the magistrate judge. In contrast, Bolden, when alerted to issues in the case, immediately saw what needed to be done to resolve Reilly's situation and ordered him transferred out of Parnell. Thus, the result here likely would have been far different had the transfer taken place substantially earlier.

#### B.

The deputy clerk will enter a judgment in favor of Reilly and against Grayson, Cross, and Daniels for $ 54,750 and a dismissal as to Kallus and Hutchinson.